EXHIBIT 1

## *R M CAMPBELL INDUS. v. MIDWEST RENEWABLE ENERGY*

Docket number: S 15-529

SUPREME COURT OF NEBRASKA

September 30, 2015

**Reporter**

2015 NE S. CT. BRIEFS LEXIS 125 *

R M **CAMPBELL** INDUSTRIAL, INC., Plaintiff/Appellee **v.** **MIDWEST** **RENEWABLE ENERGY**, LLC, Defendants/Appellant

**Prior History:** ON APPEAL FROM THE DISTRICT COURT OF DOUGLAS COUNTY HONORABLE TIMOTHY P. BURNS, DISTRICT COURT JUDGE.

## Counsel

Jerrold L. Strasheim (#14070), Omaha, NE,  Attorney for Appellant .

## Title

 BRIEF OF APPELLANT **MIDWEST** **RENEWABLE ENERGY**,

## Text

 **[\*1] STATEMENT OF BASIS OF JURISDICTION**

 Jurisdiction for this Appeal from the final order styled "Judgment of Verdict" entered and filed May 22, 2015 and underpinning Orders exists under *Neb. Rev. Stat. § 25-1912* (Reissue 2008), *Neb. Rev. Stat. § 33-103* (Reissue 2008) and Nebraska Rule of Appellate Practice *§ 2-101*. Appellant/Defendants Notice of Appeal was timely filed on June 12, 2015.

 **STATEMENT OF CASE**

 A.  Nature Of The Case. R. M. **Campbell** Industrial, Inc. ("**Campbell**"), the Plaintiff below and the Appellee here, in a jury trial recovered a money judgment in the amount of $ 154,510.98 against **Midwest** **Renewable Energy**, LLC ("MRE") on a disputed breach of contract claim.

 The contract which MRE allegedly entered into and breached consists of a two page purchase order from KL Process Design Group, LLC ("KL") to **Campbell** in the amount of $ 2,411,431.02 ("Subcontract") (E10, E11:170,174) which **Campbell** accepted.

 **Campbell**'s operative amended complaint (T19,1) alleges that "Defendants ordered a quantity of goods from the Plaintiff which was delivered to the Defendants" under the Subcontract; that the alleged "order and delivery constitute a contract under UCC Art. 2"; and "Defendants **[\*2]**  breached the contract by failing to pay Plaintiff."

 The plural "Defendants" refers to MRE and KL **Energy** Corporation. KL **Energy** Corporation is the surviving corporation now in bankruptcy into which KL was merged, (T29).

 MRE in its operative answer (T49), denied the material allegations in **Campbell**'s operative amended complaint and asserted affirmative defenses. MRE also filed a Motion for Summary Judgment (T53) and Motion to Dismiss (T36).

2015 NE S. CT. BRIEFS LEXIS 125, *2

B. How The Issues Were Decided. The trial court denied MRE's Motion for Summary Judgment (T57) and MRE's Motion to Dismiss, (T68). After the close of all evidence, MRE orally moved again to Dismiss, (558:7-559:3) which was denied.

The trial court submitted the case to a jury at the close of all evidence and the jury returned a verdict in favor of **Campbell** and against MRE in the amount of $ 154,510.98 (T93) on which the trial court entered a money judgment styled "Judgment of Verdict" (T94).

C. Statement Of Facts. MRE is a limited liability company formed under the laws of the State of Nebraska. MRE owns a corn ethanol plant in Sutherland, Lincoln County, Nebraska, ("Ethanol Plant").

Robert M. **Campbell** ("Robert") is the owner **[*3]** and principal of the Plaintiff **Campbell**, (145:5-18). **Campbell** is a company that does construction jobs having to do with instrumentation and system controls, (146:8-18). It is incorporated under the laws of the State of Arizona, (144:17-24; 152:19-153:4).

KL Process Design, LLC ("KL") is a limited liability company formed in April 2005 under the laws of South Dakota, (401:2-5; 407:11-17).

In 2006, MRE contracted with KL to complete an expansion project ("Expansion Project") of the Ethanol Plant, (333:59) (the "Expansion Contract").

Under the Expansion Contract, KL could pick its own subcontractors subject to a right of veto of MRE, (333:25-334:8). Also, the Expansion Contract expressly prohibited KLfrom binding MRE to a contract, (E44,7,9; 387:7-382:21).

In 2006, KL entered into a subcontract (the "Subcontract") with **Campbell** for Phase II of the Expansion Project, (the "Subcontract"). The Subcontract was a two page $ 2,241,321.02 purchase order ("Purchase Order") created by and issued from KL on 11/6/2006 and accepted by **Campbell** on 11/9/2006 for materials (equipment) and services (engineering services) (E10&11, 170, 174). This Purchase Order is the contract on which **Campbell** **[*4]** is suing MRE, (294:21-22). Nothing in in the Subcontract, which is on a form generated and provided by KL, indicates KL is contracting on behalf of MRE (291:23-25).

No one from MRE contacted **Campbell** about doing a job on Phase II of the Expansion Project, (290:7-18). Robert was initially contacted about doing some work on the Expansion Project by Dennis Scanlon, (154:7-10; 229:23-230:2). Scanlon was associated with KL (290:3-6).

After the initial contact of **Campbell** by Scanlon, there was a meeting in Rapid City, South Dakota between Robert and several KL employees in the offices of KL, (295:1-6) (295:11-13). Scanlon, however, was the main one with whom Robert dealt, (295:1-6). Robert understood that the work **Campbell** would be undertaking was work on Phase II of the Expansion Project, (167:25-168:4). **Campbell** worked closely with KL (220:20-24).

**Campbell** did not communicate with MRE before Robert signed the Subcontract, (303:13-15). Robert made no investigation to determine whether KL intended to make the Subcontract as agent for MRE or for itself, (303:16-304:1).

James G. Jandrain ("Jandrain"), a member of MRE's Board of Managers since its inception, and Chairman of its **[*5]** Board since 2008, testified that the Expansion Contract barred KL from being an agent of MRE, (381: 7-382:2). Randy Kramer, the managing member of KL who signed the Subcontract for KL, came from Rapid City, South Dakota to Omaha, Nebraska to testify that he did not enter into the Subcontract as agent for MRE, (401:20-402:1).

Near the time the Subcontract was signed by KL and **Campbell**, MRE had a Nebraska Employment and Investment Growth Act agreement, a/k/a LB775. If MRE invested at least $ 3 million in Nebraska and hired at least 30 people, MRE could get a 51/2 % state sales tax exemption on equipment purchases associated with the Expansion Project and a 10% investment credit for MRE's members, (359:15-25). The Nebraska State Tax

Commissioner representative told MRE that if MRE paid KL's subcontractors directly, the sales tax exemption and the investment credit would apply, (360:9-12). MRE, with KL's cooperation, decided to pay KL's subcontractors on the Expansion Project directly, rather than pay KL and KL pay its subcontractors. One of those KL subcontractors was **_Campbell_** (358:18-359:11,305:12-17).

Starting with the first invoice from **_Campbell_** to KL, MRE made the payments, **[*6]** (305:12-17). **_Campbell_** was paid at least $ 1,078,491.70 by MRE (301:15-23). **_Campbell_** never inquired why payments were not coming from KL but were coming from MRE, (306:6-12).

Although MRE made payments to **_Campbell_**, KL controlled the performance of the Subcontract and the timing of payments. Every invoice from **_Campbell_** went to KL. All **_Campbell_** invoices were approved by a minimum of three KL Principals, (339:15-21). If so approved, KL forwarded the invoices to MRE for payment. MRE paid only **_Campbell_** invoices approved by KL, (339:15-21).

The Expansion Project was a failure. **_Campbell_** completed some of the Subcontract, but did not finish, (362:22-23).

Under the Subcontract, **_Campbell_** agreed to supply goods (equipment) and services (engineering) and to make the equipment work (316:10-16). The top four items of Exhibit 10 is equipment **_Campbell_** was to order and supply to the job, (292:25-293:7) (294:18-20). The bottom five items on Exhibit 10 are for the services to be rendered by **_Campbell_** (224:2-14). The services to be provided under Exhibits 10 and 11 are engineering work associated with instrumentation and a control system for the Ethanol Plant, (190:11-14).

The equipment that **[*7]** **_Campbell_** agreed to supply to the job is equipment that was to be bought by **_Campbell_** and resold to KL, not equipment that **_Campbell_** was to manufacture, (296:5-8).

**_Campbell_** performed part, but not all of the Subcontract, (307:21-25). It did not supply the equipment of $ 974,913 (E20, 2) (293:4-19). The total equipment **_Campbell_** claims it supplied to the job is $ 623,000, (318:21-320:1).

**_Campbell_** refused to perform its side of the Subcontract and supply equipment unless prepaid for equipment, (296:17-23); also charged KL a purchase order fee of 7%, (295:14-21 );and **_Campbell_** billed KL for insurance, (295:22-296:1). There is nothing in the Subcontract obligating KL to prepay, to pay a purchase order fee, or to pay insurance.

Robert testified the engineering services performed by **_Campbell_** on the Subcontract resulted in fees of $ 590,135 (545:23-546:2).

**_Campbell_** filed a construction lien on the Ethanol Plant in Lincoln County, Nebraska before bringing this action, (E4, 36; 314:17-19). Another construction lien holder commenced an action in the District Court in North Platte, Lincoln County, Nebraska for foreclosure of its construction lien and for breach of the Subcontract on which **[*8]** that purported lien was based. The Lincoln County Action named as parties several defendants who had filed construction liens on the Ethanol Plant, including **_Campbell_**. When **_Campbell_** did not file any pleadings or motions in the foreclosure action, the District Court in Lincoln County, Nebraska entered a Default Judgment against **_Campbell_** barring a Construction Lien on the Ethanol Plant, (E54.E55, 36). The Construction Lien which is the subject of that Default Judgment is for the same goods and services as **_Campbell_** claims in this case.

Additional facts may be included below in the Arguments.


**STATEMENT OF ERRORS**

The district court committed reversible errors by any or all of the following acts or omissions:

1. Failing to grant the motion of **_Midwest_** **_Renewable Energy_**, LLC ("MRE") for summary judgment.

2. Failing to grant the motions of MRE to Dismiss.

3. Failing to grant MRE's motions for a Directed Verdict.

4. Holding that there was sufficient evidence for a jury question on i) whether KL acted as an agent of MRE when KL entered into the Subcontract, ii) that KL had actual or apparent authority to bind MRE to the Subcontract, and iii) submitting those issues to the **[*9]** jury.

5. Holding that Article 2 of the Neb. UCC and not the common law of contracts applied to the transaction of the Subcontract and instructing the jury on Provisions of Article 2 of the Neb. UCC dealing with the formation of contracts.

6. Holding that there was a jury question on whether the Subcontract was an enforceable contract between MRE and **_Campbell_**.

7. Failing to hold that it was essential for **_Campbell_** to prove it substantially performed **_Campbell_**'s obligations under the Subcontract in order to recover for its breach and to so instruct the jury.

8. Holding that the evidence of claimed damages suffered by **_Campbell_** was sufficient for a jury question on breach of contract damages, giving the jury an incorrect instruction on damages over MRE's objection, and not instructing the jury on quantum meruit.

9. Holding that there was sufficient evidence for a jury question on whether MRE proximately caused damages to **_Campbell_** of any amount and to submit that issue to the jury.

10. Failing to give the substance of instructions requested by MRE, giving instructions incorrectly stating the law to the jury over MRE's objection, and failing to instruct the jury on defenses **[*10]** MRE pled and supported by the evidence.

## PROPOSITIONS OF LAW

I. An Appellate Court Reviews A Case On The Theories Pursued By The Parties, Not On A Theory The Parties Might Have Raised. _Linda N. V. William N., 289 Neb. 607 (2014)_.

II. In Order To Recover In An Action For Breach Of Contract The Plaintiff Must Plead And Prove The Existence Of A Promise, Its Breach, Damages And Compliance With Any Conditions Precedent. _Henriksen v. Gleason, 263 Neb. 840, 847 (2002)_;   _NJI_ 2d15.01 at 1086 (2014-2015).

III. A Fundamental And Indispensable Basis Of An Enforceable Contract Is That There Be A Meeting Of Minds Of The Parties As To The Essential Terms And Conditions Of The Contract. _Peters v. Halligan, 182 Neb. 51,53(1967)_.

IV. To Successfully Bring An Action On A Contract, A Plaintiff Must First Establish That The Plaintiff Substantially Performed Plaintiff's Obligations Under The Contract. Any Deviation From The Contract Must Be Relatively Minor And Unimportant. _VRT, Inc. v. Dutton-Lainson Co., 247 Neb. 845 (1995)_.

**_V_**. The Question Of Agency Is One Of Fact. _Nebraska Tractor & Equipment Co. v. Great Lakes Pipe Line Co., 156 Neb. 366 (1953)_.

VI. The Burden Of Proving The Existence Of Agency And That The Acts Of The Agent Were Within The Agents Authority Rests Upon The Party **[*11]** Alleging The Agency. _Nebraska Tractor & Equipment Co. v. Great Lakes Pipe Line Co., 156 Neb. 366(1953)_.

VII. One Who Is Placed On Inquiry Notice As To An Agents Authority, And Who Has Reasonable Means Of Making Inquiry, Occupies The Same Position In Law As If He Had Knowledge Of The Agent's Lack Of Authority. _Franksen v. Crossroads Joint Venture, 245 Neb. 863, 871-72 (1994)_.

VIII. If There Has Not Been Substantial Performance, The Contractor Has No Claim For The Unpaid Balance Of The Contract But May Have A Claim In Restitution. *Peters v. Halligan, 180 Neb. 51 (1967)*; *§ 237 Restatement 2d Contracts* (1981), comment "d".

IX. To Constitute Reversible Error In A Civil Case, The Admission Or Exclusion Of Evidence Must Unfairly Prejudice A Substantial Right Of A Litigant Complaining About Evidence Admitted Or Excluded. *State ex rel. City of Alma v. Furnas County Farms, 266 Neb. 558,565 (2003)*.

X. Proof Of Elements Of A Breach Of Contract Claim Other Than The Proper Measure Of Damages, Results In Recovery Of Only Nominal Damages. *Section 346(2) Restatement 2d of Contracts* (1981).

XI. To Maintain Litigation In Nebraska, A Foreign Corporation Doing Business Here Must Obtain A Certificate From The Nebraska Secretary Of State. *Neb. Rev. Stat. § 21, 20,169* (repealed **[*12]** effective January 1, 2016).

XII. In Any Damage Action For Breach Of Contract, The Claimant Must Prove That The Breach Of Contract Was The Proximate Cause Of The Damages. *Union Ins. Co. v. Land and Sky, Inc., 253 Neb. 184 (1997)*.

XIII. Mere Knowledge That A Contractor Is Building On Property Is Not Sufficient To Establish That The Contractor Is The Agent Of The Owner Where The Owner Takes No Part In The Planning Or The Building. *Thomas v. George, 105 Neb. 51 (1921)*.

XIV. A Party Is Entitled To Restitution Only To The Extent That He Conferred A Benefit On The Other Party By Way Of Performance Or Reliance. *Section 370 Restatement 2d Contracts* (1981).

XV. Whether Jury Instruction Given By A Trial Court Are Correct Is A Question Of Law Which An Appellate Court Resolves Independently Of The Conclusion Reached By The Trial Court. *Nauenburg v. Lewis, 265 Neb. 89 (2003)*.

XVI. To Establish Reversible Error From A Court's Failure To Give A Requested Instruction, An Appellant Has The Burden Of Showing That (1) The Tendered Instruction Is A Correct Statement Of The Law; (2) The Tendered Instruction Is Warranted By The Evidence; And (3) The Appellant Was Prejudiced By The Court's Failure To Give The Tendered Instruction. *Malone v. American **[*13]** Business Information, Inc., 264 Neb. 127,137 (2002)*.

XVII. Whether Requested To Do So Or Not, It Is The Trial Court's Duty To Instruct The Jury On The Pertinent Law Of The Case And All Material Issues Presented By The Pleadings And Supported By The Evidence; And An Instruction Which, By Omission Of Certain Elements, Has The Effect Of Withdrawing From The Jury An Essential Issue Or Element In The Case, Is Prejudicially Erroneous. *State v. Thomas, 262 Neb. 985, 1004 (2002)*; *In re Sanitary & Improv. Dist. No. 384 of Douglas Co., 259 Neb. 351, 360 (2002)*; *Bussell v. Western Diesel Power, Inc., 216 Neb. 822, 824-25 (1984)*.


**SUMMARY OF ARGUMENT**

The $ 154,410.98 money judgment on the verdict in favor of **_Campbell_** and against MRE should be reversed for any of multiple errors.

MRE's Motion for Summary Judgment on the grounds that this action is barred by claim preclusion *(res judicata)*, issue preclusion (collateral estoppel) or both, was erroneously denied. MRE's Motion to Dismiss this case because **_Campbell_** is a foreign Corporation doing business in Nebraska without a certificate from the Nebraska Secretary of State was erroneously denied.

Assuming this case should have gone to trial - which MRE denies - the evidence is insufficient to establish that the Subcontract is an enforceable **[*14]** contract between **_Campbell_** and MRE.

The Expansion Contract between MRE and KL is a contract between two independent contractors. KL has never been MRE's agent or had any authority -actual or apparent - to bind MRE to the Subcontract. It does not authorize KL to make contracts binding on MRE.

The Subcontract is also a contract between two independent contractors, namely KL and **_Campbell_**.

Assuming the Subcontract is an enforceable contract between MRE and **_Campbell_** - which MRE denies - **_Campbell_** cannot successfully sue MRE for breach of contract because **_Campbell_** did not substantially perform its side of the Subcontract. Moreover, **_Campbell_** is not entitled to recover damages for breach of contract, but only is entitled to recover, if anything, quantum meruit damages. **_Campbell_**'s failure to prove any correct damages limits any recovery by **_Campbell_** to nominal damages.

The trial court abused its discretion by admitting Exhibits 60 and 61. Those documents were obtained by Robert from the internet in January 2015. No foundation was shown and no cause was shown for not listing them on **_Campbell_**'s Exhibit List as required by the trial court's order.

The district court committed reversible **[*15]** errors by: (1) its instructions for the formation of a contract based on the Nebraska UCC; (2) submitting the case to the jury on insufficient or no evidence; (3) refusing to hold and instruct the jury that to recover, **_Campbell_** had the burden to prove that **_Campbell_** substantially performed its obligations under the Subcontract; (4) refusing to hold and instruct the jury that **_Campbell_** had the duty to investigate whether KL made the Subcontract as agent for MRE or the duty to act non-negligently and prudently; and (5) refusing to instruct the jury that apparent authority required **_Campbell_** to prove **_Campbell_**'s belief of agency was a reasonable belief of KL based on evidence traceable to MRE .

**ARGUMENT**

I. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY DENYING THE MOTION OF MRE FOR SUMMARY JUDGMENT.

This action was filed on November 20, 2008 after **_Campbell_** had filed a Construction Lien on the Ethanol Plant on April 11, 2008, (E4)(314:17-19). On September 29,2008, Avid Solutions, Inc. ("Avid") had commenced a foreclosure of an alleged construction lien on the Ethanol Plant in the District Court of Lincoln County, Nebraska in North Platte ("Lincoln County Action"). In paragraph 12 **[*16]** of the Avid Complaint (E5) it was stated: "_RM_ **_Campbell_** Industrial, Inc. is a foreign corporation which may claim some right, title or interest in the Property by virtue of a Construction Lien recorded as Document No. 2008-02339 in the records of the Register of Deeds of Lincoln County, Nebraska." In its complaint, (E5), Avid had named **_Campbell_** as a claimant holding a construction lien on the Ethanol Plant and served a summons on **_Campbell_**, (E6).

**_Campbell_** ignored the Lincoln County Action. On June 7, 2011, the District Court in the Lincoln County Action, entered a Journal Entry and Order (E7) which in relevant part provided that: " _a default judgment will be entered against any Defendant who does not appear at the contested trial in this matter set to commence on Wednesday, June 15, 2011 at 9:00 a.m._" **_Campbell_** did not appear. On July 14, 2011, the District Court in the Lincoln County Action entered a Decree (E8) which included a default judgment against **_Campbell_**:

" _On the 15th day of June, 2011, the ... cause came on for trial. . ._ _RM_ **_Campbell_** Industrial, Inc. did not appear. . . although . . . served with process.. in this matter... the following liens are dismissed and released **[*17]** .. .the interest of the Defendant, _RM_ **_Campbell_** Industrial, Inc. under the construction lien filed in the Office of the Register of Deeds of Lincoln County, Nebraska on April 11, 2008 as Instrument No. 2008-02339 ..._"

Default judgment against ***Campbell*** bars this action under the doctrine of *res judicata* (claim preclusion). As the Nebraska Supreme Court in *Eicher v. Mid America Financing Investment Corporation, 270 Neb. 370, (2005)* ("Eicher") ruled:

> "The doctrine of *res judicata* or claim preclusion bars relitigation of a matter that has been directly addressed or necessarily included in a former adjudication if (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits and (4) the same parties or their privies were involved in both actions ... *The doctrine bars relitigation not only of those matters actually litigated, but also of those matters which might have been litigated in the prior action...*"

*270 Neb. at 386-87*; *Hara v. Reichert, 287 Neb. 577 (2014)*.

The cause of action that ***Campbell*** alleged or might have alleged against MRE in the Lincoln County Action is the same as the cause of action that ***Campbell*** [*18] has alleged in this action. As the Supreme Court said in *Baer v. Southroads Mall, Ltd Partnership, 252 Neb. 518 (1997)*: " *The general test to determine the identity of causes of action is whether the same evidence will sustain both the present and former actions. .. . It is clear from the transcript that the same evidence will sustain both the present and former actions,*" *252 Neb 518 at 525*. See also *Eicher, supra, 270 Neb. at 387-388*. The default judgment against ***Campbell*** in the Lincoln County Action is a judgment on the merits for purposes of res *judicata, Mabile v. Drivers Mgmt., Inc., 11 Neb. App. 765, 762, (2003)*; *Cole v. Clarke, 10 Neb. App 981(2002)*.

Since *res judicata* bars all causes of action that might have been asserted by ***Campbell*** against MRE in the Lincoln County Action even though they were not actually asserted, *res judicata* bars any cause of action against MRE associated with the construction lien that ***Campbell*** filed on the property of MRE. ***Campbell*** might have filed against MRE in the Lincoln County Action to foreclose its construction lien and any cause of action to recover on the debt, if any, the construction lien secured, *Tilt-up Concrete, Inc. v. Star City/Federal, Inc., 261 Neb. 64(2001)*.

Collateral estoppel (issue preclusion) also is a bar of relitigation [*19] of issues decided by the default judgment against ***Campbell*** in Lincoln County. The issues barred include whether MRE owes ***Campbell*** a debt. In *Reeves v. Watkins, 208 Neb. 804 (1981)* a mechanic's lien of Watkins' was allowed and foreclosed in an earlier action, and Watkins then brought a second action on the contract secured by the mechanic's lien. The court ruled:

> " *We believe that Watkins' position is taken by him because he does not fully appreciate the significance of the mechanic's lien foreclosure ... It is clear... that before one may claim a mechanic's lien one must have a contract, expressed or implied. .. it was incumbent upon Watkins to raise the validity or nonperformance of the contract in the mechanic's lien foreclosure. Objections which go to the validity or nonperformance of the lien or the debt on which it is based may be set up in defense of an action to enforce the lien... We must therefore conclude that following the trial in the district court involving the mechanic's lien .. . Watkins had no defense to invalidate the agreement. Those findings. . . may not again be litigated under the doctrine of collateral estoppel...*" (emphasis added)

*208 Neb. at 808-810*.

*Tilt-up Concrete [*20] v. Star City/Federal, 261 Neb. 64 (2001)* (T57) cited by the district court is inapplicable. *Res judicata* (claim preclusion) and collateral estoppel (issue preclusion) are affirmative defenses. They were not raised or decided in *Tilt-up*.

It was reversible error not to grant MRE's Motion For Summary Judgment.

II. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO DISMISS THIS CASE.

Plaintiff **_Campbell_** is a foreign Corporation, organized under the laws of State of Arizona. In the original Complaint filed by **_Campbell_** on November 20, 2008 (T1), it is alleged in paragraph 1 that: "Plaintiff is a corporation duly authorized to do business in the State of Nebraska."

In its Amended Answer (T8) filed on April 21, 2009, Defendant MRE denied the allegations in paragraph 1 of the Complaint that "Plaintiff is a corporation duly authorized to do business in the State of Nebraska." In subsequent Amended Answers, starting on August 18, 2009 (T13), MRE repeated its denial that Plaintiff was authorized to do business in the State of Nebraska and alleged as an affirmative defense that this action was barred by the failure of **_Campbell_** to obtain a certificate from the Nebraska Secretary of State as **[*21]** required by Nebraska Statutes (T16: T49).

On January 14, 2015, MRE filed a Motion to Dismiss this case for failure of **_Campbell_** to obtain a certificate of authority from the Nebraska Secretary of State, (T36). On May 13, 2015, after a hearing, the district court entered an order denying MRE's Motion to Dismiss, stating that "The Court finds Defendant's argument is unpersuasive and denies the Motion to Dismiss" (T68).

In plain language, the Nebraska Business Corporation Act in *Neb. Rev. Stat. § 21, 20,*169(1) provides. " **_(1) A foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority_** ."

The record shows that **_Campbell_** transacted business by the following: contracting and carrying out a $ 7,000 job at the ethanol plant; contracting by the Subcontract in the amount of $ 2,411,431.02 to provide equipment and engineering services on the Expansion Project in Sutherland, Nebraska; filing a construction lien on the Ethanol Plant in Sutherland, Nebraska (E4); receiving payments of over $ 1,000,000 from Nebraska to Arizona on the Subcontract; and shipping **[*22]** equipment with a cost of over $ 600,000 to Nebraska in partial performance of the Subcontract.

At the conclusion of all the evidence, MRE renewed its Motion to Dismiss, (558:7-559:3).

It was up to **_Campbell_**, in the six or seven years after initiating this action, to maintain it by complying with the statute. *Rigid Component Systems v. Nebraska Component Systems, Inc., 202 Neb. 658, 659 (1979).* But that still requires the Secretary of State's certificate. Id. The dismissal of this action because of **_Campbell_**'s deliberate disregard of *§ 21-20,* 169(1) where the "record is devoid of any offering to procure the certificate" is appropriate. Id.

It was reversible error to not dismiss this action because **_Campbell_** chose not to abide by Nebraska law and Nebraska policy.

III. THE RECORD ESTABLISHES AS A MATTER OF LAW THAT KL WAS NOT IN AN AGENCY RELATIONSHIP WITH MRE.

Whether an agency relationship existed between MRE and KL in connection with the Expansion Project is a question of fact., *Koricic v. Beverly Enterprises- Neb., 278 Neb. 713, 717 (2009).* There is no presumption of its existence, *Meier v. Geldis, 148 Neb. 234, 237 (1947).* A principal may act on the presumption that third persons will not act blindly or negligently but use prudence to ascertain **[*23]** the existence of the agency and the extent of the agent's authority. *Nebraska Tractor & Equipment Co. v. Great Lakes Pipe Line Co., 156 Neb. 366, 376-378 (1953). Meier v. Geldis, supra,* citing *Bartholomew v. Skelly Oil Co., 144 Neb. 51, 54 (1943)* and *Wagoun v. Chicago B. & Q. R.R., 155 Neb. 132, 138 (1952); Warner v. Sohn, 86 Neb. 519, 523 (1910)* *("In proving authority of an agent for the purpose of binding the principal by the farmers transaction, there must be evidence of the agency at that time").*

Thus there are three essential elements to prove the existence of an agency relationship: (1) consent (or assent) by the principal; (2) consent (or assent) by the agent; and (3) right of principal to control acts of agent, *Franksen v. Crossroads Joint Venture, 245 Neb. 863, 871 (1994);* Restatement 2d Agency § 1 (1958); Restatement 3d Agency § 1(2006).

There is no evidence in the record that MRE manifested any consent or assent to an agency relationship with KL. There is also no evidence in the record that KL ever manifested any consent or assent to act as the agent of MRE. And there is no evidence in the record that MRE had any right or control over the Subcontract. The right of MRE to veto KL's choice of subcontractors does not create the right to give affirmative directions, and does not constitute the right of control. Comment to § 101 of the Rst. 3d Agency (2006) at p 7.

*Campbell* pled this case on the theory that the liability of MRE to *Campbell* on the Subcontract was created by KL acting on behalf of MRE as its agent. The operative amended complaint (T19) which alleges that the cause of action is for goods "ordered" by MRE and KL through KL's Purchase Order attached to the complaint as an exhibit, limits *Campbell*'s cause of action to one of contracting by MRE through KL with *Campbell*. Since the Purchase Order is [*24] not issued by MRE, *Campbell* tried the case on the theory that the Subcontract was created through KL making it as a contract binding on MRE. Appellate courts decide a case on the same theory as it was tried in the case below. *Linda N. v. William N.,289 Neb. 607 (2014)*; *Professional Business Services Co. v. Rosno, 268 Neb. 99, 113 (2004)*. So all of the eggs of *Campbell* are in the agency basket.

It was reversible error to submit to the jury the question of whether KL acted as agent for MRE when KL entered into the Subcontract.

IV. THE RECORD ESTABLISHES AS A MATTER OF LAW THAT KL HAD NO ACTUAL OR APPARENT AUTHORITY TO MAKE A CONTRACT BINDING UPON MRE AND DID NOT DO SO.

KL was an independent contractor, (E44, 381:1-3), *Herman v. Bonanza Buildings, Inc., 223 Neb 474 (1986)* (stating criteria for independent contractor). KL had no actual or apparent authority to make the Subcontract a contract with *Campbell* that was a binding contract between MRE and *Campbell*.

A. No Actual Authority. The relationship of MRE and KL is governed by the Expansion Contract that was received in evidence as Exhibit 44. Jandrain, the managing member of MRE's governing Board of Managers, testified that under Exhibit 44, KL picked their own subcontractors [*25] for the Expansion Project; that KL had no right to operate as an agent of MRE, (333:17-335:8); and that Exhibit 44 expressly prohibited KL (382:5-21) from making any contract binding upon MRE. In his testimony, Jandrain pointed to paragraphs 2.2.1 and 2.7.4 in Exhibit 44. The latter at page 9 provides:

2.7.4 "   *Nothing in the contract documents is intended or deemed to create any legal or contractual relationship between MRE and design consultant, any subcontractor or sub-subcontractor, except that KL Process shall provide in its contracts with subcontractors and sub-subcontractors that MRE is an intended third party beneficiary of those contractors with the right to enforce them*."

(382:5-16); see also Rst. 3d Agency § 201 (2006)

There was no contradictory evidence to the existence or effect of the provisions of Exhibit 44. Actual authority can only exist if the alleged principal -here MRE - manifests consent and the alleged agent - here KL - has the reasonable understanding at the time the alleged agent takes action that agent acted with authority. Neither manifestation of consent by MRE nor reasonable understanding by KL that it had such authority is included in the evidence [*26] here. There is no grant of actual authority - only a prohibition against actual authority. Kramer, the managing member of KL who signed the purchase order that is the Subcontract testified that he did not enter into the Subcontract as an agent of MRE and that he entered into it as an agent for KL (401:13-402:1). So there is no evidence that MRE manifested consent to any actual authority of KL to act on behalf of MRE in making the Subcontract. And there is no evidence that Kramer reasonably believed he acted on behalf of MRE in signing the Subcontract.

By its proposed Instruction No. 3 (T75), MRE requested that the district court in describing MRE's defense to the jury include that KL not only was not an agent of MRE, but was   **an independent contractor now in bankruptcy** and on page 7 of Instruction No. 3 denied that *Campbell* '7s   *owed money under its contract with such independent contractor*" By its proposed Instruction No. 5 (T78) which is a correct statement of the law, MRE requested the district court to give an instruction on the definition of an Independent Contractor, but the court

refused. There was substantial evidence that KL was an independent contractor including the **[*27]** Expansion Contract (E44) and the testimony of Jandrain, (333:25-334:12).

A litigant is entitled to have the jury instructed upon all material issues and theories of the case presented by such litigants' pleadings and supported by competent evidence, _Tapp v. Blackmore Ranch, Inc.,245 Neb. 40, 56(1998); Zorinsky v. American Legion Omaha Post No. 1, 163 Neb. 212, 215 (1956)._

B.  No Apparent Authority. There is no evidence that KL had apparent authority to enter into the Subcontract as a binding contract between MRE and **_Campbell_**. Under Nebraska law, "Apparent or ostensible authority to act as an agent may be conferred if the alleged principal affirmatively, intentionally, or by lack of ordinary care, causes third persons to act upon the apparent authority, _Franksen v. Crossroads Joint Venture, supra, 245 Neb. at 871_, citing _Corman v. Musselman, 232 Neb. 159 (1989)_ and _Western Fertilizer v. BRG, 228 Neb. 776 (1988)._

The apparent authority for which a principal may be liable must be traceable to the principal, _Franksen v. Crossroads Joint Venture, Supra, 245 Neb at 871_, citing _Corman v. Musselman, supra_ and _Pioneer Animal Clinic v. Garry, 231 Neb. 349 (1989);_Rst 3d Agency § 3.03 (2006). See also §§ 2.03 and 2.02 of Rest. 3d Agency.

**_Campbell_** seeks to **[*28]** hold MRE responsible to the Subcontract. KL signed it on 11/6/ 2006 and **_Campbell_** signed it on 11/9/2006, (E10.E11). The evidence in the record is that there were no communications between **_Campbell_** and MRE before **_Campbell_** signed the Subcontract and no such communications for a long time after they signed the Subcontract. In other words, there was no manifestation of any intent or promise traceable to MRE. Any belief of **_Campbell_** was not a reasonable belief since the Subcontract itself did not even hint that MRE was a party, all negotiations, plans and exchanges of information did not hint that MRE was a party to such subcontract.

Any vague answers of Robert in answer to leading questions as to whether KL represented that KL had such authority, not only is flatly contradicted by KL (401:20-402:1), but is incompetent and not admissible, _Rodine v. Iowa Home Mut. Casualty Co., 171 Neb. 263, 274 (1960)._

Added to that, as discussed below, **_Campbell_** was put on inquiry notice of the correct facts. The inquiry notice of **_Campbell_** means that **_Campbell_** is held by law to know that MRE itself never intended or promised to make any contract with **_Campbell_**, KL had no power to make a contract that was binding on MRE, and **[*29]** there is no evidence that KL pretended to have such power or thought it did, _Franksen v. Crossroads Joint Venture, 245 Neb. 863, 871-72 (1994)._

It was error for the district court to fail to hold that as a matter of law KL was not authorized to make the Subcontract a contract between MRE and **_Campbell_**, and not direct a verdict that KL did not do so.

_**V**_. THE RECORD ESTABLISHES AS A MATTER OF LAW THAT NO CONTRACT WAS MADE OR EXISTED BETWEEN MRE AND **_CAMPBELL_**.

There is insufficient evidence in the record to support a finding that the Subcontract was an enforceable contract between MRE and **_Campbell_**.

A.  No Meeting Of Minds. It is axiomatic that a written contract is not binding unless there is a meeting of the minds as to its essential terms and conditions, _Peters v. Halligan, 182 Neb 51,106 (1967)_ _("... we bear in mind the basic rule that a fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract'); City of Scottsbluff v. Waste Connections of Neb., Inc., 282 Neb. 848, 861 (2011)_ ("To create a contract . . . there must .. . also be a meeting of the minds or a binding mutual understanding between the parties to the contract"). **[*30]** _American Prairie Constr. Co. v. Hoich, 594 F.3d 1015,1023 (8th Cir. 2010)_ _("It's hard to imagine a contract term more essential than the identity of the parties. .. Because TSF and NCC did not come to a meeting of minds with respect to this essential term, no contract was ever formed")._

2015 NE S. CT. BRIEFS LEXIS 125, *30

There is no evidence that MRE consented to be bound to **_Campbell_** by the Subcontract. The competent evidence is that no communication occurred between MRE and **_Campbell_** before the Subcontract was signed. Robert testified (304:14-24): 14Q. You did not have any information, however, that 15 they were entering - that KL was entering into Exhibit 10 16 on behalf of MRE, did you? 17A. No. 18Q. Certainly no information from MRE? 19A. **No, sir, other than all the "ship to" was to** 20 **_Midwest_ _Renewable_ _Energy_ in Sutherland**. 21Q. And that is the total of the information you had 22 as to what was being shipped? 23A. **Correct. And whatever else was explained to me 24 by Dennis or others.**

Randy Kramer, who was one of the two founders of KL (401:2-3) and was the managing member of KL who issued the Purchase Order, which is the Subcontract (E10.E11), testified that he entered into the Subcontract as agent of KL and not as agent of MRE, (401:20-402:1). **[*31]** And Jandrain testified at length that such a contract was prohibited by the Expansion Contract, (E44; 332:18-333:9; 333:25-334:15; 335:1-9).

Robert did not investigate whether **_Campbell_** was entering into a contract with KL or MRE, (303:16-305:22).

MRE requested the district court to instruct the jury that in order for a contract to have existed between MRE and **_Campbell_**, there must have been a meeting of minds on essential terms and conditions (T91). The pleadings denied that a contract between MRE and **_Campbell_** existed (T49). Evidence supported that no such contract - actually subcontract - existed. The district court did not so instruct the jury.

B.    No Promise By MRE. For the Subcontract to have been a contract between MRE and **_Campbell_** there must have been a promise by MRE to **_Campbell_**. *Section 1 of the Restatement 2d of Contracts* (1981) ("Rst. 2d Contracts") defines a contract: "§ 1    *Contract Defined. A contract is a promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.*"

Rst. Contracts in § 2(1) states that: "    *(1) A promise is a manifestation of intention to act or refrain from* **[*32]** *acting in a specific way, so made as to justify a promisee in understanding that a commitment has been made...*"

*Harmon Cable Communications Ltd Partnership **v.** Scope Cable Television, Inc., 237 Neb. 871, 882 (1991)*. (same) There is no evidence in the record that MRE had any communication with **_Campbell_** of any kind before **_Campbell_** signed the Subcontract; that MRE had the intent to contract; or that MRE made any promise to **_Campbell_**.

The only evidence in the record of any conduct of MRE that conceivably could be associated with any intent or promise of MRE to be bound to a contract with **_Campbell_** is that MRE made the payments owed by KL to **_Campbell_** on the Subcontract. Such payments, however, not only were equivocal in nature, but they were made after the Subcontract was signed by both KL and **_Campbell_**. Moreover, uncontradicted evidence shows these payments were not the result of any intent or promise to enter into a contract but instead were the result of the intent to obtain the benefits of the Nebraska Employment and Investment Growth Act (359:12-25), and in lieu of making the payments to KL and KL then making the payments to **_Campbell_**. As uncontradicted evidence also shows, although such payments were made **[*33]** by MRE to **_Campbell_**, each check by which MRE made a payment identified by purchase order number that the payments were payments on the Subcontract; that the parties to the Subcontract never modified its provisions to make MRE a party; that the payments made by MRE to **_Campbell_** were under the total control of KL and each payment was made by MRE to **_Campbell_** only if authorized by at least three managing members of KL; that the only exchange of promises associated with the Subcontract was between KL and **_Campbell_**; that the only exchange of performances was between KL and **_Campbell_**, and that the only exchanges of information and the only communication associated with the Subcontract were communications between KL and **_Campbell_**.

In this very case, **_Campbell_**, a subcontractor of KL, purchased materials -valves for example - from other vendors in the performance of the Subcontract. The vendors did not become parties to the Subcontract.

C.    No Proximate Cause. **_Campbell_** did not prove that MRE's ceasing payments was the proximate cause of its purported claims, it was obligated to do, *Union Ins. **v.** Land and Sky, Inc., 253 Neb. 184 (1997)*. **_Campbell_**'s contract was with KL and KL's bankruptcy is the proximate cause. **[*34]**

D.  No Substantial Performance. To successfully bring an action for breach of contract, a plaintiff must establish that plaintiff substantially performed plaintiffs obligations under the contract, *VRT, Inc. v. Dutton-Lainson Co., 247 Neb. 845 (1995)*. To prove substantial performance, any deviation from the contract must be material minor or unimportant. Id;  *Lange Bldg. and Farm Supply, Inc. v. Open Circle "R", Inc., 216 Neb. 1 (1983)*. The record shows that **Campbell** did not substantially perform its side of the Subcontract and that the obligations that **Campbell** did not perform under the Subcontract are not relatively minor or unimportant.

E.  Unreasonable Belief Of **Campbell** Of Existence Of Contract. It was unreasonable for **Campbell** to believe that MRE was obligated to perform the Subcontract. The payments MRE made to **Campbell**, which were identified by KL purchase order number and KL invoice number were to be payments against KL's obligations under the Subcontract.

The fact that **Campbell** was receiving the checks from MRE rather than from KL for payments on the Subcontract, placed **Campbell** on inquiry notice of the reasons why he was receiving these checks. **Campbell** did not, however, inquire as to how it was [*35] that payments were coming from MRE and not KL, (306:6-12). The fact that the checks identified that they were payments on the Subcontract and on invoices under that contract also places **Campbell** on such inquiry notice. **Campbell** had reasonable means of making inquiry of KL, with which it had ongoing communications, and of making inquiries of MRE, to which it ended up sending invoices and from which it received checks, and learning from such inquiries that these things were not indicative of MRE's intent or promise to contract with **Campbell**. The contact of **Campbell** with KL was "more or less continuous after the first contact," (320:8-11). When payments to **Campbell** were slow, Robert made numerous contact to both KL and MRE (322:1-4).

Under the doctrine of inquiry notice, **Campbell** occupies the same position in law as if **Campbell** had made inquiries and acquired actual knowledge that MRE was making the payments directly to **Campbell** and not through KL in order to obtain the benefits of 51/2% sales tax exemption and the 10% investment credit provided by the Nebraska Employment and Investment Growth Act (359:15-25).  *Franksen v. Crossroads Joint Venture, 245 Neb. 863, 871-72 (1994)*.

Apart from inquiry notice, the [*36]  fact that MRE owned the Ethanol Plant is an insufficient reason for **Campbell** to reasonably believe it had a contract with MRE,  *Thomas v. George, 105 Neb. 51 (1921)* ("Mere knowledge by wife that husband is constructing buildings on her (wife) premise does not establish agency when he acts for himself alone, and when she takes no part in the planning or direction of the construction of the house").

It was reversible error to submit to a jury the question whether the Subcontract was a binding contract between MRE and **Campbell**.

VI.  IT WAS REVERSIBLE ERROR FOR THE DISTRICT COURT TO FAIL TO GIVE THE SUBSTANCE OF AN INSTRUCTION THAT **CAMPBELL**'S RELIANCE ON APPARENT AUTHORITY REQUIRED **CAMPBELL** TO HAVE NOT ACTED NEGLIGENTLY AND TO HAVE ACTED WITH PRUDENCE.

By MRE's Proposed Instruction No. 6 (T79) and No. 7 (T80) MRE requested that the jury be instructed that apparent authority required Plaintiff to prove that (1) Defendant led Plaintiff to believe KL was authorized to enter into a contract with Plaintiff on behalf of Defendant; (2) that Plaintiff exercised reasonable diligence and prudence in ascertaining the fact of agency and the nature and extent of the agent's authority; and (3) that Plaintiffs [*37]  belief that KL had this authority was reasonable. In addition, by MRE's proposed Instruction No. 8 (T81), MRE requested the district court to instruct the jury on the meaning of negligence. Also, MRE objected to Instruction No. 5 given by the court (T105) dealing with apparent authority on the grounds that Instruction No. 5 did not include a statement that a party relying on apparent authority cannot be negligent and must use ordinary prudence, (562:13-20). MRE's proposed Instruction No. 6 states the law and is a virtual copy of NJI2d Civ. 6.08.  *Nebraska Tractor & Equipment Co. v. Great Lakes Pipe Line Co, 156 Neb. 366, 376* **holds that a person dealing with a purported agent "must not act negligently, but must use prudence to ascertain whether the agent acts within the scope of his powers" and that "third person in dealing with his agent will not be negligent in failing to ascertain the extent of his authority as well as the existence of his agency."**

The failure to instruct the jury in substance as requested and in conformity with MRE's objections to the district courts Instruction No. 5 was unfairly prejudicial to MRE. A major point made by **_Campbell_** was that **_Campbell_** had no duty to make any effort **[\*38]** to inquire whether the contract was with MRE or with KL (342:3-18: 343:8-22: 344:23-345:11).

VII. ANY DELIVERY OF ANY EQUIPMENT TO THE JOB SITE OF THE EXPANSION PROJECT WITHOUT REJECTION BY MRE DOES NOT PROVE THE SUBCONTRACT WAS A CONTRACT BETWEEN **_CAMPBELL_** AND MRE.

The provisions in Nebraska Uniform Commercial Code ("Neb. UCC") §§ 2-602 to 2-609 relating to acceptance and rejection of goods as conforming or nonconforming do not in and of themselves create a contract. *Acceptance or rejection of goods as conforming or nonconforming under the Neb. UCC has to do with performance of a contract, not the formation of a contract.* **_Campbell_** *has not pled and eschews an implied contract.* There was no contract created here under §§ 2-602 to 2-609 and any associated sections of Article 2 of the Neb. UCC by the delivery by **_Campbell_** to the Expansion Project of a part of the equipment to be supplied under the Subcontract.

A.  Article 2 Of Neb. UCC Is Inapplicable. The Neb. UCC has no application in this case. The Subcontract is a mixed contract. It provides for **_Campbell_** to supply both goods (equipment) and services (engineering), (318:10-13). The test for whether the Neb. UCC or the common **[\*39]** law of contracts is applicable to a mixed contract is whether the predominate purpose of the transaction - sometimes characterized as the primary purpose or the principal purpose - is the sale of goods and the rendition of service is only incidental or whether the predominate purpose of the transaction is the rendition of services and the sale of goods is only incidental. *Mennonite Deaconess Home & Hospital, Inc. v. Gates Engineering, Co., 219 Neb. 303, 307-309 (1985);* *MBH, Inc. v. John Otte Oil and Propane, Inc., 15 Nebraska App. 341, 348-49 (2007).*

The services of **_Campbell_** predominate the Subcontract. Those services are stated in the last five items on the first page of the Subcontract (E10). These are Item 5 (Phase II Engineering and Field Support); Item 6 (Graphics/Data Base/ Alarming); Item 7 (DCS Startup); Item 8 (DCS Application Work); and Item 9 (Project Management). The services contemplate that **_Campbell_** will supply and make work the Instrumentation and Controls for the Ethanol Plant (146:8-18; 296:9-14; 308:14-18). These are services for which Robert had extensive experience and claimed a high degree of expertise. That was the reason that KL sought out **_Campbell_**, (146:8-153:11). The reason was not for tangible products, but for the **[\*40]** intangible skills and the need for the expertise and skills of Robert.

The services that **_Campbell_** agreed to render were engineering services, (184:11-185:20) which included: providing an estimation of the cost of the project (541:9-542:4); ordering items (318:17-20); building the DCS cabinets (Distribution Control System cabinets) (549:5-6); as well as putting the hardware in them (550:16-23); building controls and making sure the system worked (553:5-16); revising piping and instrument diagrams (185:10-20); revising data base per new or revised piping and instrument diagrams (186:3-20); start doing the logic and graphic development (187:12-24); preparation of 2200 loops diagrams (187:25-188:6); installation of software (310:12-311:1); configuration of the DCS (E12) (550:18-511:2); and field testing (551:14-21). The total amount that **_Campbell_** claimed was for the incomplete services it supplied as distinct from the equipment it supplied is $ 590,135 (545:23-546:2).

The equipment under the Subcontract that **_Campbell_** contracted to supply was equipment that **_Campbell_** was buying, not manufacturing (296:5-8). MRE could order the equipment that **_Campbell_** agreed to order, but until someone **[\*41]** configured it, it wouldn't work (311:18-25).

MRE Objected to Instruction No. 6 dealing with the formation of a contract (T106) on the grounds that the Neb. UCC did not apply to this case and common law contract principles governed the formation of a contract. This is because the predominant part of the Subcontract was for services to be performed by **_Campbell_** and the "goods" were only incidental, (563:2-11).

In summary, the Subcontract obligated *Campbell* to select the Instrumentation and create a working Control System for the entire Ethanol Plant, *Herman v. Bonanza Bldgs., Inc., 223 Neb. 474, 481 (1986)* ("The predominant purpose of the transaction was not to sell Mr. Herman the components for a building but rather to create a building for him"). The same reasoning applies here.

Instruction No. 6 only confused the jury as to whether a contract was formed between MRE and *Campbell* and was highly prejudicial to MRE. Common law contract principles applied, not the UCC. Instruction No. 6 was contrary to law, misleading and incorrect as to the law applicable to this action and reversible error.

B.  <u>MRE Not Buyer</u>. Moreover, Neb. UCC §§ 2-602 to 2-609 are only applicable to "buyers" and MRE is not a "buyer" **[*42]** as defined by *§ 2-103*(1 )(a) of the Neb. UCC. "Buyer(s)" means a person who buys or contracts to buy goods. Only KL was a "Buyer".

C.  <u>No Evidence Of Delivery To MRE</u>. There is no evidence in the record that any delivery of any equipment by *Campbell* to the job site of the Expansion Project was a delivery to MRE rather than delivery to KL. *Campbell* had no firsthand knowledge that any equipment was delivered at all (214:24-215:6). And the title to any equipment *Campbell* delivered to the job site of the Expansion Project passed upon delivery to KL, not to MRE, *Neb. UCC § 2-401(2)*; *Maryott v. Oconto Cattle Co, 259 Neb. 41, 49 (2000)*.

Thus, it was reversible error for the trial court to submit Neb. UCC standards to the jury as applicable to the formation of a contract between MRE and *Campbell*.

Also, *Campbell* received a $ 490,581.81 payment on an invoice for Distributive Control System Cabinets - that is cabinets with hardware inside them - and spent the $ 490,581.51 for something else, hardly a deviation from the Subcontract that is only relatively minor and unimportant.

MRE Objected to Instructions Nos. 3 and 8 given by the district court on the grounds that such instructions fail to include an **[*43]** instruction that in order to recover damages for breach of contract, the Plaintiff must have substantially performed its side of the contract, (562:6-10; 563:18-564:8). A litigant is entitled to have the jury instructed upon all material issues and theories of the case presented by such litigants pleadings and supported by competent evidence, *Tapp v. Blackmore Ranch, Inc., 254 Neb. 40, 56 (1998)*; *Zorinsky v. American Legion Omaha Post No. 1,163 Neb. 212, 215 (1956)*.

It was reversible error to not hold and give the substance of an instruction to the jury that in order to collect breach of contract damages for breach of the Subcontract, *Campbell* was required to prove that it had substantially performed its side of the Subcontract.

The services for which *Campbell* claimed and was paid over $ 590,000 were of no benefit or value to MRE.

VIII.  *CAMPBELL* FAILED TO PROVE THE PROPER MEASURE OF DAMAGES.

The correct measure of damages where a contractor on a construction job is not allowed to complete performance is that such contractor is entitled to the remedy of quantum meruit.  *Omaha Public Power Dist. v. Darin & Armstrong, Inc., 205 Neb. 484 (1980)* following *Kroeger v. Franchise Equities, Inc., 190 Neb. 731 (1973)*. Under quantum meruit, the law demands adequate **[*44]** proof that the charges of *Campbell* were fair and reasonable, *Rieschick Drilling Co. v. American Casualty Co., 208 Neb. 142, (1981)*. *Campbell*'s proof does not include any evidence of the fair and reasonable value of *Campbell*'s partial performance and does not include any benefit from that partial performance to MRE. Hence, it does not include proof of any legally cognizable damage. (It also does not include evidence of profit.) Therefore, even if *Campbell* has proved the other essential elements of a breach of contract claims against MRE, it is entitled to recover only nominal damages , *Restatement 2d Contracts § 346(2)* (1981) (... if the amount of the loss is not proved ... a small sum . .. will be awarded as nominal damages").

IX. IT WAS REVERSIBLE ERROR FOR THE DISTRICT COURT TO ADMIT INTO EVIDENCE EXHIBITS 60 AND 61 OBTAINED FROM THE INTERNET.

On January 21, 2015 the district court entered an Amended Trial Order which set the case for trial on May 20, 2015 through Friday, May 22, 2015, (T46). The provisions of that Amended Trial Order in paragraph 1 and required that "all actual trial exhibits be identified in writing by each party no later than May 6, 2015 (two weeks prior to trial); and copies of exhibits be exchanged by May 6, 2015."

On May 8, 2015, **Campbell** filed Plaintiff's Exhibit List (T63) and also Plaintiffs **[*45]** Amended Exhibit List (T60). As the Amended Trial Order also provided, the parties' Exhibits were required to be submitted to the district judge's court reporter no later than May 13, 2015.

On January 16, 2015, well before the May 6, 2015 exhibit deadline, Robert acquired from the website of MRE purported offers of MRE to sell equipment that **Campbell** had purportedly delivered to the Expansion Project. (Robert printed off a screen which became Exhibits 60 (instrumentation category) and Exhibit 61 (valve category). When they were offered at trial, MRE objected to Exhibit 60, on the grounds that it was not on the Exhibit List (537:5-11), insufficient foundation (539:8), it doesn't establish that any property was delivered or sold and it simply identifies property on Exhibit 10, (539:8-14). The court overruled MRE's objections, Id. MRE made the same objection to Exhibit 61 and it was also overruled (539:19-541:3). No motion was ever made by **Campbell** to amend its exhibit list.

The foundation for Exhibits 60 and 61which was missing, included: who authored those Exhibits, whether those Exhibits were authentic, whether they were put on the internet by a representative of MRE who was authorized **[*46]** to do so, whether those Exhibits were hearsay, and whether they were misleading.

Exhibits 60 and 61 were not admissible because they violated the Amended Trial Order. No cause for not complying with the order was shown or attempted to be shown. No reason was given by the district court for ignoring its own Order. Hence, the orders overruling MRE's objections were abuse of discretion.

Even though the admission of evidence is a matter of discretion for the district, the admission of evidence is reversible error if, as here, it unfairly prejudices a substantial right, _Worth v. Kolbeck, 273 Neb. 163, 176 (2007)_.

The substantial rights of MRE that were violated include: (i) No opportunity to rebut the undisclosed exhibits (presented at the end of the trial when all out of town rebuttal witnesses had left the courtroom); (ii) Rebuttal Exhibit 57 offered by MRE was not accepted; (iii) Exhibit 60 & 61 were in direct contradiction to Robert's testimony that all equipment was not delivered; (iv) the Exhibits listed all items of equipment on the Purchase Order - not the items of equipment Robert testified were delivered or purchased (307:21-25; 308:1-11). The Exhibits were calculated by **Campbell** to knowingly **[*47]** create the false impression that all equipment on the Exhibits had been delivered, whereas those Exhibits directly contradicted Plaintiffs own testimony which was confusing, misleading and unfair.

X. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY NOT GRANTING MRE'S MOTIONS FOR A DIRECTED VERDICT.

When **Campbell** rested at the end of its case in chief, MRE moved for a Directed Verdict and Dismissal with Prejudice. The district court overruled MRE's Motion for a Directed Verdict, (390:24-392:1).

At the close of all the evidence, MRE renewed its Motion for a Directed Verdict made at the close of **Campbell**'s case. The district court also overruled this Motion for a Directed Verdict, (558:3-7; 559:6-20).

In assessing a Motion for a Directed Verdict the trial court should grant the Motion if at the close of evidence reasonable minds cannot differ and can draw but one conclusion, _Credit Bureau Services, Inc. v. Experian Info._ _Solutions, Inc., 258 Neb 526 (2013)_. ("Given the evidence admitted at trial, on this record, reasonable minds could not differ and there is not more than one conclusion which can be drawn from the evidence.") Because only one conclusion can be drawn from the evidence in this **[*48]** action and that is that **Campbell** has not proved a prima facie case for the reasons set out above, it was reversible error for the district court to overrule and not grant MRE's Motion for a Directed Verdict and Dismissal of this action.

CONCLUSION

2015 NE S. CT. BRIEFS LEXIS 125, *48

For the reasons set forth above, and each of them, MRE respectfully requests that this Court reverse the Judgment of Verdict of the district court and enter judgment in favor of MRE, or, reverse the Judgment of Verdict and remand the case for a new trial or grant MRE such other relief as is appropriate.

Respectfully submitted this 29th day of September 2015.

***Midwest Renewable Energy*** LLC

Defendant

By:   /s/ [Signature]

Jerrold L. Strasheim (#14070)

3610 Dodge St., Suite 212

Omaha, NE 68131-3218

Phone: 402.346.9330

E-mail: *jls@strasheimlaw.com*

Its attorney

## AFFIDAVIT OF SERVICE

STATE OF NEBRASKA

COUNTY OF DOUGLAS

Jerrold L. Strasheim, being first duly sworn on oath, deposes and states as follows:

1. That he is the attorney for the Appellant in the above-captioned matter.

2. That on September 29, 2015, he caused two (2) copies of the Brief of Appellant ***Midwest Renewable Energy***, LLC, to be mailed **[*49]** by first class mail, adequate postage prepaid, to the following attorney of record at the following address:

Karl von Oldenburg

Brumbaugh & Quandahl, P.C., L.LO.

4882 S. 118th, Suite 100

Omaha, NE 68137

FURTHER AFFIANT SAYETH NOT.

/s/ [Signature]

Jerrold L. Strasheim

SUBSCRIBED AND SWORN to before me this 29th day of September, 2015.

/s/ [Signature]

Notary Public

**End of Document**

## *INDUSTRI v. MIDWEST RENEWABLE ENERGY*

Docket number: S 15-529

SUPREME COURT OF NEBRASKA

October 26, 2015

**Reporter**

2015 NE S. CT. BRIEFS LEXIS 153 *

R. M. **_CAMPBELL_** INDUSTRI, AL, INC., Plaintiff-Appellee, vs. **_MIDWEST RENEWABLE ENERGY_**, LLC, Defendant-Appellant.

**Prior History:** APPEAL FROM THE DISTRICT COURT OF DOUGLAS COUNTY, NEBRASKA Honorable Timothy P. Burns. Douglas County District Court Case No. CI10-9380303.

## Counsel

Karl Von Oldenburg, #20228, BRUMBAUGH & QUANDAHL, P.C, Omaha, NE,  ATTORNEYS FOR APPELLEE .

## Title

 **BRIEF OF APPELLEE, R. M. _CAMPBELL_ INDUSTRIAL, INC.**

## Text

**[*1] I. JURISDICATIONAL STATEMENT**

Appellee accepts Appellant's statement of the Basis of Jurisdiction as stated by Appellant.


**II. STATEMENT OF THE CASE**

**A.  <u>NATURE OF THE ACTION</u>:**

 This case is an appeal from a jury verdict obtained in the District Court of Douglas County. The Jury awarded Plaintiff, R.M. **_Campbell_** Industrial, Inc. (**_Campbell_**/Appellee) $ 154,510.98 against **_Midwest Renewable Energy_**, LLC (MRE/Appellant).

 MRE owns an ethanol plant in Nebraska. MRE planned an expansion project at the plant in an amount in excess of $ 50 million. As part of the expansion, MRE hired **_Campbell_** through their Agent, KL Process Design Group, LLC (KL) to provide goods and services. **_Campbell_** provided the goods and services as promised until the time MRE ran into financial trouble and a work stoppage was ordered. At all relevant times it was understood that KL was the general, but MRE was responsible for payment as the owner. In fact, **_Campbell_** would submit the invoices to KL for review and would receive payment directly from MRE. This was the case until MRE defaulted on payment. Despite numerous acknowledgements of the debt and promises to pay by MRE, payment was not forthcoming. **_Campbell_** filed **[*2]**  suit in the District Court of Douglas County where MRE is headquartered for Breach of Contract. MRE, at Trial, denied any relationship with **_Campbell_** and denied liability. The matter was tried and submitted to a jury. The Jury found MRE was liable for the balance due on the invoiced work in the amount of $ 154,510.98.

**B.    ISSUES TRIED BEFORE THE COURT:**

 The initial issue presented before the District Court was if **_Campbell_**, as a foreign corporation, was transacting business in Nebraska to the extent requiring a Certificate of Authority to maintain a suit. Next, did a real property

2015 NE S. CT. BRIEFS LEXIS 153, *2

lien action regarding the MRE plant expansion in Sutherland filed in Lincoln County District Court bar this litigation on the theories of Res Judicata and Collateral Estoppel. Finally, was MRE liable for goods and services provided to the MRE ethanol plant by **_Campbell_** and ordered by KL.

### C.  HOW THE ISSUES WERE DECIDED AND THE NATURE OF THE JUDGMENT:

The Trial Court denied MRE's Motion to Dismiss based on no Certificate of Authority. The Court further denied MRE's Motion for Summary Judgment based on Res Judicata and Collateral Estoppel. The Jury came back with a verdict in favor of **_Campbell_** in **[*3]** the amount of $ 154,510.98.

### D.    SCOPE OF REVIEW:

An appellant court reviews a district court's order granting a motion to dismiss de novo.  *Central Nebraska Public Power and Irr. Dist. **v**. North Platte Natural Resources Dist.; 280 Neb. 533, 538, 788 N.W.2d 252*

An appellate court will affirm a lower court's granting of summary judgment if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Howsden **v**. Roper's Real Estate Co., 282 Neb. 666, 805 N.W.2d 640 (2011).*

The applicability of the doctrines of res judicata and collateral estoppel is a question of law.  *Etcher **v**. Mid America Fin. Invest. Corp., 270 Neb. 370, 702 N.W.2d 792 (2005).*

A jury verdict will not be disturbed on appeal unless it is so clearly against the weight and reasonableness of the evidence and so disproportionate as to indicate that it was the result of passion, prejudice, mistake or some other means not apparent in the record, or that the jury disregarded the evidence or rules of law.  *McDonald **v**. Miller, 246 Neb. 144, 145-46, 518 N.W.2d 80, 82-83 (1994).*

## III.   PROPOSITIONS OF LAW

1. An appellant court reviews a district court's order granting **[*4]**  a motion to dismiss de novo.   *Central Nebraska Public Power and Irr. Dist. **v**. North Platte Natural Resources Dist.; 280 Neb. 533, 538, 788 N.W.2d 252*

2. An appellate court will affirm a lower court's granting of summary judgment if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material issue as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.  *Howsden **v**. Roper's Real Estate Co., 282 Neb. 666, 805 N.W.2d 640(2011)*

3. The applicability of the doctrines of res judicata and collateral estoppel is a question of law.  *Eicher **v**. Mid America Fin. Invest. Corp., 270 Neb. 370, 702 N.W.2d 792 (2005)*

4. A jury verdict will not be disturbed on appeal unless it is so clearly against the weight and reasonableness of the evidence and so disproportionate as to indicate that it was the result of passion, prejudice, mistake or some other means not apparent in the record, or that the jury disregarded the evidence or rules of law.  *McDonald **v**. Miller, 246 Neb. 144,145*-46, *518 N.W.2d 80, 82-83 (1994)*

5. The Nebraska Court of Appeals have found that res judicata, which refers to claim preclusion and collateral estoppel, which refers to issue preclusion are two different **[*5]**  concepts.  *Day **v**. Heller, 10 Neb. App. 886,893 (2002)*

6. The doctrine of res judicata means a final judgment on the merits is conclusive upon the parties in any litigation involving the same cause of action.  *Day **v**. Heller, 10 Neb. App. 886,893 (2002)*

2015 NE S. CT. BRIEFS LEXIS 153, *5

7. The doctrine of collateral estoppel applies when an ultimate fact has been determined by a final judgment with the result that the issue cannot be litigated by the same parties in a future lawsuit.  *Day v. Heller, 10 Neb. App. 886,893 (2002)*

8. Res judicata or claim preclusion, applies if: (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits, and (4) the same parties or their privies were involved in both actions.  *DeVaux v. DeVaux, 245 Neb. 611 (1994)*

9. Collateral estoppel, or issue preclusion, applies if: (1) the identical issue was decided in a prior action, (2) there was a judgment on the merits which was final, (3) the party against whom the rule is applied was a party or privity with a party in the prior action, and (4) there was an opportunity to fully and fairly litigate the issue in the prior action.  *In re Interest of Jaden H, 10 Neb. App. 87 (2001)*

10. Nebraska courts have held that in interpreting res judicata the words "same **[*6]** cause of action" draw to the limiting meaning of the black letter law in defining of the law set forth above.  *Gasper v. Flott, 209 Neb. 260,263 (1981)*

11. A cause of action has been defined as consisting of a primary right possessed by a plaintiff with a corresponding duty upon a defendant, combined with a derelict or wrong done by the defendant.  *Gasper v. Flott, 209 Neb. 260, 263 (1981)*

12. Conclusiveness of a prior judgment, including matters which might have been raised under the doctrine of res judicata, does not apply where a second or later action is a separate and distinct cause of action.  *Id.*

13. What the Nebraska Supreme Court established in its ruling is that construction liens and breach of contract actions are distinct and concurrent, and may be pursued at the same time or in succession.  *Tilt-up Concrete v. Star City, 261 Neb. 64 (2001)*

14. "This rule is consistent with the well-known principle that a statutory construction which removes a common law right should not be adopted unless the plain words of the statue compel it. ...The NCLA [lien act] contains neither an express provision nor any language indicating that the NCLA was meant to preclude other remedies that a lien holder might pursue to collect a contractual debt. **[*7]** We therefore conclude that the NCLA does not take away a construction lienholder's common law right to sue for breach of contract."  *Tilt-up Concrete v. Star City, 261 Neb. 64 (2001)*

15. Court need only look to  *Neb. Rev. Stat.* § 21 -20,168(2)(k) (reissue 2008), to ascertain that conducting interstate commerce does not constitute transacting business in Nebraska which would require **_RM Campbell_** to obtain a certificate of authority

16. The United States Supreme Court reversed the Mississippi Supreme Court because the warehousing of cotton in Mississippi was the first step in a long process of interstate commerce.  *Allenberg Cotton Company, Inc. v. Pittman, 95 S.Ct. 260 (1974)*

17. "Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will be customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from explitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has **[*8]** given it reality."  *Allenberg Cotton Company, Inc. v. Pittman, 95 S.Ct. 260 (1974)*

18. Nebraska Law also makes it clear that **_Campbell_** does not need a Certificate of Authority to collect on the debt he is owed from MRE in Nebraska Courts.  *Neb.Rev.Stat.* § 21-20,168(h)

2015 NE S. CT. BRIEFS LEXIS 153, *8

19. Nebraska Law even allows **_Campbell_** to maintain a proceeding against MRE.   *Neb.Rev.Sat. § 21-20,* 168(a)

20. The Employment & Investment Growth Act is cited in  _§ 77-4101_  to 4112.   *Neb.Rev.Stat. § 77-4101*

21. Part of the Act is to benefit Nebraska businesses who want to expand   *Neb.Rev.Stat. § 77-4102(2)*

22. The statute is clear the benefits are for Nebraska Taxpayers who directly purchase goods and services for this case, an expansion.   *Neb.Rev.Stat. § 77-4103(15)*

23. The benefits MRE sought and testified to are found in   *Neb.Rev.Stat. § 77-4105*

24. This Court defines apparent authority as: Apparent authority is the power which enables a person to affect the legal relations of another with third persons, professedly as agent for the other, from and in accordance with the other's manifestation to such third persons. A party who has knowingly permitted others to treat one as his agent is estopped to deny the agency. **[*9]**   *Ryder Truck-Rental v. Transportation Equip Co.,* 215 neb. 458, 461, _339 N.W.2d 283, 286 (1983)_. See also, _Draemel v. Rufenacht, Bromagen & Hertz, Inc., 223 Neb. 645, 392 N.W.2d 759 (1986)_

25. Apparent or ostensible authority to act as an agent may be conferred if the alleged principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon the apparent agency. *178   _Wolfson Car Leasing Co., Inc. v. Weberg, 200 Neb. 420,427,264 N.W.2d 178,182 (1978)_

26. Apparent Authority is such authority as the agent seems to have by reason of the **570 authority he actually has.. .A principal is bound by, or liable for, the acts which an agent does within his or her actual or apparent authority.   _Mueller v. Union Pacific Railroad, 220 Neb. 742, 752, 371 N.W.2d 732, 739 (1985)_

27. Apparent or ostensible authority agency for which a principal may be liable must be traceable to the principal and cannot be established by the acts, declarations or conduct of the agent.   _Draemel v. Rufenacht, Bromagen & Hertz, 223 Neb. 645, 651, 392 N.W.2d 759, 763 (1986)_

28. Apparent authority of an agent cannot be restricted or extended by corporate by-laws or other corporate instructions upon third parties in the absence of actual notice.   _Johnson v. Milwaukee,. 46 Neb. 480, 64 N.W. 1100 (1895)_; _Kesselman v. Goldsten, 148 Neb. 452, 27 N.W.2d 692 (1947)_

29. Ratification is the confirmation or adoption **[*10]** of an act that has already been performed. A Principal can, for example, ratify something that has been done on his or her behalf by another individual who assumed the authority to act in the capacity of an agent.   *West's Encyclopedia of American Law Edition 2 (Copyright 2008)*

30. Under the Nebraska law, the rule is a principal must disaffirm the unauthorized act of his agent within a reasonable time after such act comes to his knowledge, or he will be bound thereby; and a principal will not be permitted to adopt that part of a contract made by his agent which is beneficial to him, and reject the remainder.   *Farmers & Merchants National Bank of Auburn, 49 Neb. 379, 68 N.W. 488,489 (1896)*

31. It is the Trial Court's duty to instruct the Jury on the issues presented by the pleadings and supported by the evidence. If the instructions taken as a whole correctly state the law, are not misleading and adequately cover the issues, there is no prejudicial error upon which a reversal on appeal may be based.   _Gilbert v. Archbishop Bergan Mercy Hospital, 228 Neb. 148,421 N.W.2d 760 (1988)_

32. A contract has been substantially performed if the claimant proves all three of the following elements: (1) It made an honest endeavor in good faith to perform its **[*11]** part of the contract; (2) the results of its endeavor are beneficial to the other party, and (3) the other party retained those benefits.   _ADC-I, Ltd. v. Pan American Fuels, Limited-Gulf Coast, 247 Neb. 71, 75, 525 N.W.2d 190 (1994)_

## IV.  STATEMENT OF FACTS

MRE owns an ethanol plant in Sutherland, Nebraska. [BOE 506:1-4]. In August of 2006, MRE hired ***Campbell*** through its employee Randy Kramer to do work on a phase I project [BOE 161:3-25] [E36]. ***Campbell*** was contacted by KL for the phase I job by Randy Kramer. Randy Kramer was also employed at the same time by MRE. [BOE 416:1-9]. ***Campbell*** completed the work on phase I and submitted the invoice as instructed by KL. [BOE 162:17-25; 163:1-14]. ***Campbell*** was paid for his services by MRE [BOE 163:24-25].

***Campbell*** was informed in 2006 by KL that MRE was planning an expansion and identified as phase II [BOE 168:1-6]. ***Campbell*** was told he was doing work for MRE through KL. [BOE 168:20-25]. Parties entered into a Purchase Order Agreement [E10; Ell]. The Agreement was for MRE Phase II, signed by Robert ***Campbell*** and Randy Kramer, and was signed in November of 2006. [E10]. Billing for Phase II went through KL initially, but later, upon direction and on or about May 15, 2007, went **[*12]** directly to MRE. [BOE 210:3-7]. As part of the job, KL provided ***Campbell*** an MRE Expansion Scope of Work document. [E14]. The document, as expected, reveals KL to be the contractor and MRE as the owner, who on the first page of the document states: the "owner has engaged the services of a third party (***RM Campbell*** Industrial/MTL)". ***Campbell*** provided goods and services and invoiced KL and later MRE directly [BOE 180:17-25]. Payments were made on some of the invoices. [El5]. All of the payments received for work done were always paid by MRE. [El5]. Each check was signed by Penny Thelen, the Comptroller of MRE, and for Phase II. [BOE 207:14-18]. ***Campbell*** provided his services to everyone's satisfaction. [BOE 210: 8-24]. ***Campbell*** was proceeding along and no issues were raised until payments were late to eventually stopping. [BOE 210:25; 211:1-7]. In August of 2007, KL writes ***Campbell*** regarding MRE's expansion and financial issues. The letter explains that new financing should come soon and apologizes for any hardship this causes ***Campbell***, but they will get through it together. [E24]. The letter does not complain about any services ***Campbell*** has provided, but thanks ***Campbell*** for his loyalty. **[*13]** ***Campbell*** questions the lack of payment and is informed that money is not available but ***Campbell*** will be paid when funds become available. No complaints about ***Campbell***'s work product. The amount in arrears at that point was $ 716,901.74. [E30]

***Campbell***, on February 12, 2008, writes Randy Kramer requesting a payment plan to get caught up. [E22]. The response to the letter comes directly from MRE Headquarters in Omaha, Nebraska. The letter dated February 13, 2008, is from Penny Thelen, Comptroller for MRE. The letter acknowledges ***Campbell***'s work and money owed. The letter explains the update on finding financing and encloses a check for $ 32,089.96, and thanks him for his patience. Again, this letter is from MRE. [El7]. The $ 32,089.96 is the last check paid by MRE while still acknowledging MRE owes ***Campbell*** more money. The letter did state $ 30,000.00 would be paid on the 14th of each month. [El7]. Pursuant to Ms. Thelen's letter, ***Campbell*** provided an updated excel spreadsheet of invoices and amounts owed. [El 9]. On March 24, 2008, ***Campbell*** emails Ms. Thelen of MRE asking where the promised $ 30,000.00 payment due on the 14th is. [El8]. Ms. Thelen immediately responds to ***Campbell*** **[*14]** and courtesy copied Jim Jandrain, MRE Chairman. Thelen apologizes for not sending the $ 30,000.00. She explains all money going to operations. Again, she promises to pay, but MRE is grateful for ***Campbell***'s patience, and that ***Campbell*** has been one of the best contractor's. [El 8]. No complaints about ***Campbell***'s work product.

On or about February 13, 2008, ***Campbell*** receives a letter from MRE's Manager, Mr. Jandrain. The correspondence from MRE is an audit letter. The letter establishes ***Campbell***'s work relationship with MRE amounts expended and amounts due from MRE to ***Campbell***. [E21]. Jandrain of MRE admits he signed the letter [BOE 346:6-7]. ***Campbell*** fills out his portion of the letter and sends it in on or about March 14, 2008. ***Campbell*** is notified by KL that work is stopped on Phase II [E23]. Although, the letter expresses the hope that it is a temporary stoppage, the project never resumes. MRE eventually sells some equipment for Phase II on MRE website, including ***Campbell***'s equipment [E60; E61]. ***Campbell***, after given credit for all payments made, testifies that he is owed $ 158,798.00. The matter is submitted to the Jury which finds MRE liable to ***Campbell*** in the amount of $ 154,510.98. **[*15]**

## *V*. ARGUMENT

## 1.  THE DISTRICT COURT DID NOT ERR IN DENYING MRE MOTION FOR SUMMARY JUDGMENT

2015 NE S. CT. BRIEFS LEXIS 153, *15

MRE' motion for summary judgment was based on facts which are uncontroverted. MRE is the alleged owner of real property upon which improvements were done by several contractors. As result of the work, several contractors including **_Campbell_** filed construction liens pursuant to Nebraska law. [El, 4] On or about September 29, 2008 a lien holder, Avid Solutions inc. (Avid) filed a complaint. [E5] The first cause of action as by Avid's, is Avid's common law action of breach of a contract. This cause of action only relates and touches upon MRE as the sole defendant. Count two of the complaint in question is the only action which mentions **_Campbell_** and the complaint is clearly a construction foreclosure action which at stake was the individual's rights with regard to the lien on the real property. The record is clear that **_Campbell_** like many other contractors opted not to participate in the lien foreclosure action, thereby losing any interest **_Campbell_** had in the statutory construction lien. **_Campbell_** did preserve its common law right and filed this current action which is now before this Court. [**\*16**]

The operative facts as presented by MRE's proposed exhibits is that Avid filed suit against MRE for breach of contract and **_Campbell_** on construction lien foreclosure. MRE, at no time filed any motion to add or consolidate claims and in fact never served **_Campbell_** with any suit or claim in the District Court of Lincoln County matter C.I. 08-678 in which Avid was the Plaintiff.

MRE, argues the Lincoln County action and results thereof precludes **_Campbell_** from pursuing the current action before this Court. Defendant argues res judicata and collateral estoppel prevents **_Campbell_**'s allegations to be re-litigated.

As a matter of law MRE's motion for summary judgment should have been denied. The common law right to claim breach of contract and the statutory right to foreclose a construction lien are separate and distinct actions. **_Campbell_**'s common law right to pursue breach of contract cannot be denied or precluded by a separate lien action. In 2008, Avid and Avid only filed a construction lien action against **_Campbell_**. The relief requested was that limited by the Nebraska lien foreclosure act. MRE based on the limited record presumably filed an answer but never filed any type of crossclaim [**\*17**] against any party much less **_Campbell_**. Under these facts and based on the law MRE's motion should be denied

MRE raises res judicata and collateral estoppel as the legal concept which entitles MRE to its requested motion for summary judgment. The Nebraska Court of Appeals have found that res judicata, which refers to claim preclusion and collateral estoppel, which refers to issue preclusion are two different concepts. _Day v. Heller, 10 Neb. App. 886,893 (2002)_. The doctrine of res judicata means a final judgment on the merits is conclusive upon the parties in any litigation involving the same cause of action. _Id._ The doctrine of collateral estoppel applies when an ultimate fact has been determined by a final judgment with the result that the issue cannot be litigated by the same parties in a future lawsuit. _Id._

Res judicata or claim preclusion, applies if: (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits, and (4) the same parties or their privies were involved in both actions. _DeVaux v. DeVaux, 245 Neb. 611 (1994)_.Collateral estoppel, or issue preclusion, applies if: (1) the identical issue was decided in a [**\*18**] prior action, (2) there was a judgment on the merits which was final, (3) the party against whom the rule is applied was a party or privity with a party in the prior action, and (4) there was an opportunity to fully and fairly litigate the issue in the prior action. _In re Interest ofJadenH., 10 Neb. App. 87 (2001)_.

MRE's res judicata claim fails as a matter of law and based on the uncontroverted facts. No claim was ever directly litigated by and between parties or privies. Avid had a cause of action against MRE for breach of contract and then Avid had a cause of action against all other contractors for a statutory lien foreclosure. No evidence has been presented or exist that Avid and **_Campbell_** are or were privies. Avid was merely a separate contractor who like many others was tired of waiting to be paid and took action. Avid's breach of contract action other than dealing with work on the same property has none of the same merits to which this court could apply claim preclusion.

Nebraska courts have held that in interpreting res judicata the words "same cause of action" draw to the limiting meaning of the black letter law in defining of the law set forth above. _Gasper v. Flott [**\*19**] , 209 Neb. 260, 263 (1981)_. A cause of action has been defined as consisting of a primary right possessed by a plaintiff with a

corresponding duty upon a defendant, combined with a derelict or wrong done by the defendant.    *Id.* Conclusiveness of a prior judgment, including matters which might have been raised under the doctrine of res judicata, does not apply where a second or later action is a separate and distinct cause of action.    *Id.*

This Court, as the Lower Court stated, need look no further then Nebraska Supreme Court case entitled   *Tilt-up Concrete v. Star City, 261 Neb. 64 (2001)* for resolution if lien foreclosure action and breach of contract actions are separate actions not subject to res judicata. In    *Tilt-up,* attached hereto, the company foreclosed on a construction lien and won some but not all of the money they felt owed. In a separate action years later Tilt-up filed a breach of contract action against the same defendant. The court ruled the second action was barred by the statute of limitations.    *Tilt-up @ 66.* What the Nebraska Supreme Court established in its ruling is that construction liens and breach of contract actions are distinct and concurrent, and may be pursued at the same time or in succession. **[*20]**    *Id. @    68.* As the court stated:

"This rule is consistent with the well-known principle that a statutory construction which removes a common law right should not be adopted unless the plain words of the statue compel it. ...The NCLA [lien act] contains neither an express provision nor any language indicating that the NCLA was meant to preclude other remedies that a lien holder might pursue to collect a contractual debt. We therefore conclude that the NCLA does not take away a construction lienholder's common law right to sue for breach of contract."    *Id.*

In applying the law the Court held Tilt-up was permitted after a separate construction lien action was completed and heard on the merits to file a breach of contract action. Tilt-up was defeated not by res judicata but by the statute of limitations which is not at issue in our matter. Tilt-up is direct precedent and the reason MRE's argument failed.

In the instant action MRE's collateral estoppel argument fails for the same reasons articulated above. Specifically, the same parties were not involved in each action and the cause of actions were separate and distinct. The only caveat that **_Campbell_** concedes is the issue is **[*21]** precluded the validity of the construction lien which Avid litigated. **_Campbell_**, as plaintiff in this action is not seeking relitigation of the construction lien but pursuing its own separate remedy as provided by Nebraska common law. The action is the one before this Court a breach of contract claim.

**_Campbell_**, argues the uncontroverted facts presented by MRE reveal no issues of material fact and prove that as a matter of law that MRE was not entitled to summary judgment. Res judicata and collateral estoppel are not applicable in any fashion to **_Campbell_**'s causes of action. Therefore, **_Campbell_** requests this Court affirm the District Court's denial of MRE's Motion for Summary Judgment.

## 2.    _CAMPBELL_ WAS NOT REQUIRED TO POSSESS A CERTIFICATE OF AUTHORITY FROM THE STATE OF NEBRASKA

MRE attempts to invalidate the standing of **_Campbell_** by pointing out that **_Campbell_** does not possess a Certificate of Authority issued by the Nebraska Secretary of State.    *Neb. Rev. Stat. § 21-20,169* (reissue 2008). However, this Court need only look to    *Neb. Rev. Stat. § 21-20,168(2)(k)* (reissue 2008), to ascertain that conducting interstate commerce does not constitute transacting business in Nebraska **[*22]** which would require **_RM Campbell_** to obtain a certificate of authority.

Further, the United States Supreme Court in    *Allenberg Cotton Company, Inc. v. Pittman, 95 S.Ct. 260 (1974)*, held that when the Mississippi Supreme Court refused to honor and enforce a contract between a Tennessee corporation and a Mississippi farmer due to the Tennessee Corporation not having a certificate of authority, it was violating the Commerce Clause.    *Id.* at 267. The factual scenario in    *AUenberg* is similar and dissimilar to the instant matter.    *Allenberg* involved a Tennessee Corporation who contracted with a Mississippi cotton farmer to grow his cotton crop, deliver it to a cotton gin in Mississippi and then transport it to a warehouse in Mississippi.    *Id.* at 263. The Mississippi Supreme Court held that the entire transaction was intrastate and therefore the Commerce Clause did not apply and Allenberg's lawsuit was dismissed for not having a certificate of authority to transact business as a foreign corporation in Mississippi.    *Id.* The United States Supreme Court reversed the Mississippi

2015 NE S. CT. BRIEFS LEXIS 153, *22

Supreme Court because the warehousing of cotton in Mississippi was the first step in a long process of interstate commerce.  _Id. at 266_. The Supreme Court added:

"Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will be customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from explitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality."

_Id. at 266-267_. In contrast to the facts in   _Allenberg_, **_Campbell_** has a principal place of business in Arizona, was sought out by the Appellants, purchased the products at issue in this **[*23]** matter from Massachusetts and had the products delivered to MRE's ethanol plant in Nebraska. From the beginning to the end of this transaction, it was interstate. **_Campbell_** never solicited business in Nebraska, nor had any agents soliciting business in Nebraska. **_Campbell_**, in no way is "engaging" business in the State of Nebraska, in which the State would have to protect Nebraska Citizens.

Nebraska Law also makes it clear that **_Campbell_** does not need a Certificate of Authority to collect on the debt he is owed from MRE in Nebraska Courts.  _Neb.Rev.Stat. § 21-20_, 168(h). Nebraska Law even allows **_Campbell_** to maintain a proceeding against MRE.   _Neb.Rev.Sat. § 21-20_, 168(a). MRE's argument, as briefed, is that **_Campbell_** had over seven years to get a Certificate of "Maintain" **_Campbell_**'s proceeding in an Nebraska Court. The Legislature specifically excluded activities as collection of debts and maintaining an action to do so as activities constituting doing business. Therefore, the Commerce Clause should control and **_Campbell_** should not have to obtain a certificate of authority to commence a suit in Nebraska Courts.

## 3.   MRE WAS THE PURCHASER OF GOODS & SERVICES FROM _CAMPBELL_

MRE, even **[*24]** after Trial, still does not comprehend the legal ramification of MRE's participation in the Employment and Investment Growth Act. It is undisputed MRE altered or rescinded its alleged contract (if such agreement exists) with KL regarding **_Campbell_**'s participation. The reason LB775. Penny Thelen, MRE's Comptroller, testified about the change in payment plan as follows:

"Q. How was it that MRE was paying [**_Campbell_**] invoices from KL?

A. Originally, the contract between MRE and KL was that we were going to pay them 48 million. And then we looked into the state tax incentive programs that were available, and I prepared an application for LB775, which is the Employment and Investment Growth Act. And under that act, you can get a refund of all your sales tax that you paid on the expansion project, or you can get - - and you can get 10 percent on the investment credit; and that investment credit goes - - flows through to the members of MRE; we have 40 members at MRE, and those credits are used - - can be used on their Nebraska Individual Income Tax Returns as a credit against their tax liability." [BOE 472: 9-21]

Ms. Thelen continues to explain the benefit to MRE for hiring and paying **[*25]**  **_Campbell_** directly as Nebraska Tax Payers:

"A. So we could get 48 million in credits - - investment credits and about 2.6 million in sales tax refunds, and those would go back to MRE." [BOE 473: 10-12]

Ms. Thelen, as representative of MRE again explains the need to make it clear MRE was the purchaser when she states:

"A. Well, I don't know, but when we started out the contract with KL, the vendors and contractors were sending invoices to KL in KL's name. It said KL Process Design. Then they would approve them and send them to me to pay. And I said, Randy, you have to put those invoices in MRE's name so we can get the investment credit for it." [BOE 498: 6-11]

To get the benefits, MRE had to be knowing the taxpayer purchaser. This Fact cannot be disputed, nor explained away. Benefits Ms. Thelen testified was the sole province of MRE and its members.

"Q. All right. Thank you. Now, we go on to the next section. Everyone has heard it a lot, but that tax legislation that he discussed.

A. Yes.

Q. And let's be clear on this tax legislation. Again, that's a benefit for MRE and its members, correct?

A. Yes.

Q. It wasn't a benefit that ran down to any of the subcontractors?" **[*26]**  [BOE 497: 12-20]

A. No.

MRE's January 2009 letter authored by Ms. Knapp, and made part of the record as Exhibit 27, further establishes MRE was the knowing buyer of _**Campbell**_'s goods an services. MRE acknowledges its participation in LB775. The Letter establishes that _**Campbell**_ provided services and materials and gave _**Campbell**_ the already filled out form for Nebraska tax purposes. Page 2 of Exhibit 27 lists MRE as the taxpayer. More important, MRE, by its own admission, lists itself as direct purchaser for purposes of "Nebraska Resale or Exempt Sale Certificate". [E27, 3]

The Employment & Investment Growth Act is cited in _§ 77-4101_ to 4112.  _Neb.Rev.Stat._ _§ 77-4101_. Part of the Act is to benefit Nebraska businesses who want to expand   _Neb.Rev.Stat._ _§ 77-4102(2)_. The statute is clear the benefits are for Nebraska Taxpayers who directly purchase goods and services for this case, an expansion. _Neb.Rev.Stat._ _§ 77-4103(15)_. The benefits MRE sought and testified to are found in   _Neb.Rev.Stat._ _§ 77-4105_.

MRE, based on the incentives in LB775, knowingly changed its course of action. The Act requires taxpayer involvement. MRE knowingly used the _**Campbell**_ purchases for tax incentives. **[*27]**  MRE's actions, as proven at Trial, show actual knowledge and involvement regarding _**Campbell**_. By operation of law and for the benefit of over $ 7 million MRE became the purchaser and contracted with _**Campbell**_ for goods and services.

MRE, for its part, believes holding itself out as the taxpayer purchaser has no legal effect. MRE had to have had knowledge of the _**Campbell**_ invoices, approve them, pay for them and represent the same to the State of Nebraska as an expansion of their ethanol plant. It is simply absurd for MRE to now argue it never authorized or knew of _**Campbell**_, when MRE changed who was responsible for payment of subcontractors on their own volition. MRE's testimony regarding LB775 and _**Campbell**_, on its face, creates the liability for this Court to affirm the Trial Court.

## 4.  MRE HIRED KL AS ITS AGENT FOR THE PHASE II EXPANSION

The facts presented at Trial conclusively reveal that KL was, in fact, MRE's Agent. KL was acting within its scope when KL purchased the goods and services from _**Campbell**_. Randy Kramer who was employed by MRE and KL signed the Purchase Order. [E10, 11]. The Order was signed in November of 2006. _**Campbell**_ testifies it was understood that KL was **[*28]** purchasing goods and services for the MRE expansion. More specifically, on behalf of MRE, the owner of the ethanol plant. _**Campbell**_ testified that he understood that MRE was paying for the job. _**Campbell**_'s beliefs were correct. MRE, in fact, did purchase the goods and services until default. Reads like a classic Agency Relationship and, in this case, the parties all acted in reliance of the Agency Relationship. MRE payments alone complete the actual authority loop.

MRE contends that without a writing, and despite the factual actions of the parties, no agency existed and therefore they are not liable. MRE's assertions are incorrect. Even if this Court does not see this case for what it is, actual authority, _**Campbell**_ would argue apparent or ostensible authority.

This Court defines apparent authority as: Apparent authority is the power which enables a person to affect the legal relations of another with third persons, professedly as agent for the other, from and in accordance with the

other's manifestation to such third persons. A party who has knowingly permitted others to treat one as his agent is estopped to deny the agency.   *Ryder Truck-Rental* **v**. *Transportation Equip Co*., 215 **[\*29]** neb. 458, 461, *339 N.W.2d 283, 286 (1983)*. See also,   *Draemel* **v**. *Rufenacht, Bromagen & Hertz, Inc., 223 Neb. 645, 392 N.W.2d 759 (1986)*. Apparent or ostensible authority to act as an agent may be conferred if the alleged principal affirmatively, intentionally., or by lack of ordinary care causes third persons to act upon the apparent agency. *178 *Wolfson Car Leasing Co., Inc.* **v**. *Weberg, 200 Neb. 420, 427, 264 N.W.2d 178, 182 (1978)*. Apparent Authority is such authority as the agent seems to have by reason of the **570 authority he actually has...A principal is bound by, or liable for, the acts which an agent does within his or her actual or apparent authority.   *Mueller* **v**. *Union Pacific Railroad, 220 Neb. 742, 752, 371 N.W.2d 732, 739 (1985)*.

 ***Campbell*** concedes the apparent or ostensible authority agency for which a principal may be liable must be traceable to the principal and cannot be established by the acts, declarations or conduct of the agent.   *Draemel* **v**. *Rufenacht, Bromagen & Hertz, 223 Neb. 645, 651, 392 N.W.2d 759, 763 (1986)*.

  The following admitted facts were discerned at Trial which support traceable actions by the principal MRE, creating apparent authority:

     1) MRE knowingly purchased the goods and services. [El5]

     2) MRE represented to the State of Nebraska they were purchasing the goods.   *[Ell]* [BOE 498:6-11] [BOE 510:4-16]

     3) **[\*30]**  MRE claimed the ***Campbell*** Contract as their own to the Auditors Christianson & Associates, PLLP [E21]

     4) MRE acknowledges the debt directly with ***Campbell***, apologizes, explains the financial situation, makes a payment and promise future monthly payments. [E17]

     5) MRE apologizes to ***Campbell*** for missing a payment. Explains all money diverted to operations. MRE states ***Campbell*** is one of their best contractors. [El 8,2]

     6) MRE writes ***Campbell*** admitting ***Campbell*** provided services for MRE and asks ***Campbell*** to fill out tax forms. [E27]


  MRE acted in concert with KL on the Phase II project. Their coordinated actions got MRE what they wanted and paid for. The enumerated facts listed above do show overt traceable acts upon MRE to satisfy Nebraska Apparent Authority Standard. The Jury Verdict should be affirmed.

## 5.   MRE AND KL STANDARD FORM CONTRACT IS NOT RELEVANT OR APPLICABLE TO *CAMPBELL*

  MRE relies on exhibit 44 as ironclad proof that no agency existed with KL and that MRE is free from liability. Exhibit 44 is the alleged contract by and between MRE and KL for phase II expansion of the ethanol plant. The contract, as contemplated by MRE and KL is MRE would pay over $ 55 million **[\*31]**  to KL and KL, without involving MRE, would complete phase II; KL would pay all subcontractors from the KL pot of money. The Parties agree that KL was to place in each Contract a statement that MRE is merely an innocent third party not responsible for payment. [E44, 9]

  MRE's reliance is false. The date of the Exhibit 44 Contract was agreed to in July of 2007 [E44, 11]. KL's agency contract on behalf of MRE with ***Campbell*** was signed in November of 2006, some eight months prior to Exhibit 44. Second, as testified by KL and MRE, ***Campbell*** was never made aware of the agreement and limitations of the Exhibit 44 Contract. The purchase order for MRE phase II signed by KL and ***Campbell*** makes no reference to intended third parties [MRE] as required. Randy Kramer testified no notice of MRE status was provided by KL [BOE 416:21-25; 417:19] and Jandrain testified on behalf of MRE, that they did not notify ***Campbell*** of the third party beneficiary limitation of MRE. [BOE 337:3 - 24]

The reason the Contract was not followed was because MRE changed the rules (or never agreed) for MRE's benefit, payments, and counter to the alleged Contract would be paid directly by MRE and not KL. KL and MRE did **[*32]** not follow their own Contract with regards to **_Campbell_** because it did not apply. The Contract did not apply because MRE decided to pay **_Campbell_** outside the Contract and this was done prior to MRE's alleged contract ever being signed. The proof is in the reality. In reality, MRE changed the terms for the tax benefits of LB775. In reality, MRE paid **_Campbell_** directly, acknowledging the debt. In reality MRE was paying **_Campbell_** prior to the alleged agreement by and between MRE and KL. In reality, KL acted like an agent procuring the services of **_Campbell_** for the benefit of MRE. KL did this with the knowledge and acquiescence of MRE.

Under Nebraska law, corporations cannot limit liability with corporate by-laws or instruction unknown to third parties. Specifically, apparent authority of an agent cannot be restricted or extended by corporate by-laws or other corporate instructions upon third parties in the absence of actual notice. _Johnson_ **v.** _Milwaukee,. 46 Neb. 480, 64 N.W. 1100 (1895)_; _Kesselman_ **v.** _Goldsten, 148 Neb. 452, 27 N.W.2d 692 (1947)_. It is uncontroverted that **_Campbell_** was not aware of any limitations upon KL from a Contract on behalf of MRE. MRE argues that no evidence was presented to contradict the standard Contract between MRE and KL. MRE **[*33]** is wrong. Again, the Contract was not in effect when KL sought out **_Campbell_**'s services. Further, MRE ignored its own Contract when it chose tax breaks over the Contract. Lastly, as described herein MRE actions contradict the alleged Contract. LB775, direct payments, letters ratifying the debt. As such Exhibit 44, the Contract, has no bearing in this matter.

## 6.  MRE THROUGH ITS ACTIONS RATIFIED AND ADOPTED KL CONTRACT WITH _CAMPBELL_

Even if the jury did not find an express contract by and between MRE and **_Campbell_**, the evidence established at the very least, MRE subsequently ratified and adopted the **_Campbell_** Contract. Ratification is the confirmation or adoption of an act that has already been performed. A Principal can, for example, ratify something that has been done on his or her behalf by another individual who assumed the authority to act in the capacity of an agent. _West's Encyclopedia of American Law Edition 2 (Copyright 2008)_. Ratifications are either express or implied. The former are made in express and direct terms, the latter are such as the law presumes from the acts of the Principal.

Under the Nebraska law, the rule is a principal must disaffirm the unauthorized **[*34]** act of his agent within a reasonable time after such act comes to his knowledge, or he will be bound thereby; and a principal will not be permitted to adopt that part of a contract made by his agent which is beneficial to him, and reject the remainder. _Farmers & Merchants National Bank of Auburn, 49 Neb. 379, 68 N.W. 488,489 (1896)_

MRE's ratification of the **_Campbell_** Contract is firmly established by MRE's actions and letters made part of the record. First after being made aware of **_Campbell_**'s work and specific invoices MRE directly paid **_Campbell_** for his work. As evidence in copies of payment checks from MRE to **_Campbell_** which reference **_Campbell_**'s invoices. [El5]. Further, MRE testified repeatedly of acknowledging the invoices and paying the same. MRE never rejected a single invoice. [BOE 488:13-23]. Second, when MRE hit financial trouble and was falling behind on payment MRE again acknowledged and ratified the contract and debt. Ms. Thelen, MRE's Comptroller wrote **_Campbell_** regarding amounts due. MRE, in the letter, does not repudiate **_Campbell_**'s claims. The letter acknowledges the debt and explains the project is still moving forward, makes a direct payment and promises to pay Thirty Thousand Dollars per month until **[*35]** caught up. The letter ends with MRE thanking **_Campbell_** for its patience. [El7]. Again, on March 24, 2008, after MRE misses their promised $ 30 thousand payment due on March 14, 2008, MRE again ratifies the debt [E18]. Apologizing for missing the payment, MRE states, in part: "I sincerely appreciate your patience and want to assure you that you will be paid - it's just the timing right now. It's definitely not that you're on the bottom of the list like that -just the opposite because you're one of the best contractors, but until we get financing, all our cash flows are going towards operations (corn, chemicals, denaturant utilities, payroll, etc.). I will email you again when the check is mailed. Thank you very much for your continued patience." [El 8] The email which includes MRE's Manager never repudiates or denies the debt. Again, MRE again contacts **_Campbell_** in September of 2008, by letter promising payment an ratifying the debt.

In fact no document entered into evidence, nor any live testimony disaffirms the **_Campbell_** invoices. Robert **_Campbell_** testified he never received any complaints or disaffirmance by letter or verbal communication. Mr. Kramer, in any of his capacity with KL **[*36]** or MRE, testified that he never disputed **_Campbell_**'s work or knew of

any disputes from others. [BOE 428:4-17]. In fact, his signature was one of many that approved the **_Campbell_** invoices. Likewise, MRE through the testimony of Thelen and Jandrain only affirmed the payments, but never enunciated any written disputes. MRE relied on the authorization signatures by KL and paid the bills. [BOE 358:4-10]

Therefore, even if this Court finds the overwhelming evidence does not establish either actual or apparent authority, the evidence establishes MRE ratified KL's actions with **_Campbell_** after the fact.

## 7.    MRE JURY INSTRUCTION ASSIGNMENTS ARE WITHOUT MERIT

It is the Trial Court's duty to instruct the Jury on the issues presented by the pleadings and supported by the evidence. If the instructions taken as a whole correctly state the law, are not misleading and adequately cover the issues, there is no prejudicial error upon which a reversal on appeal may be based. _Gilbert v. Archbishop Bergan Mercy Hospital, 228 Neb. 148, 421 N.W.2d 760 (1988)_. The Jury Instructions, given as a whole, conform to the evidence and correctly stated the law.

Jury Instruction No. 5 discussing apparent authority states the Nebraska Law correctly. **[*37]**  The Instruction requires the Jury to find **_Campbell_** acted reasonably. As stated earlier, apparent authority to act as an agent may be conferred if the   **principal** affirmatively, intentionally or by lack of ordinary care causes third persons to act upon the apparent agency.    _Wolfson, supra_ @ 427. There is no formal element of due diligence. The Law requires that the reliance be reasonable. In this case the evidence abundantly shows MRE affirmatively caused **_Campbell_** to rely on KL as an authorized agent. Further, no prejudice arose as MRE was the direct purchaser of the goods and services.

The Trial Court's reading of Jury Instruction No. 6 was also correct. The Purchase Order in evidence [E10] [Ell] is for goods and services. All the service work related to and touched upon the goods **_Campbell_** was creating and installing for MRE. **_Campbell_** agrees that due to MRE's work stoppage, not all the product was finally ordered. The Contract as signed and contemplated was for specific goods to be created and shipped to MRE. The engineering, although important, was incidental to the sale of the goods.

MRE arguing the U.C.C. does not apply because they were not the buyer is a self-serving **[*38]**  argument. The basis of the whole trial was proving (successfully) that MRE was the "Buyer". If you believe MRE to be the ultimate buyer then MRE purchased the goods and services, and the Instruction is appropriate.

Delivery of the goods was raised at Trial with both sides presenting evidence. The Jury, in awarding damages, found in favor of **_Campbell_**. This factual issue should not be retried for appropriateness of the Jury Instructions.

## 8.    MRE ASSIGNMENT OF ERROR REGARDING SUBSTANTIVE PERFORMANCE FAILS

MRE raises substantial performance as objections to Jury Instructions No. 3 and No. 8. MRE states **_Campbell_** is not entitled to Judgment because **_Campbell_** failed to substantially complete the Project. In support of this Argument, MRE references no facts, but merely recites case law. The record shows through no fault of **_Campbell_**, the job was stopped by MRE. [E17] [El8] [E23] [E28] [BOE 428:4-17]. **_Campbell_** was only seeking amounts for invoices for work completed before he was told to stop. **_Campbell_** was not seeking the total amount of the Contract contemplated, as such, substantial compliance does not apply.

Even if this Court accepted MRE's view, **_Campbell_** substantially performed **[*39]**  his duties. A contract has been substantially performed if the claimant proves all three of the following elements: (1) It made an honest endeavor in good faith to perform its part of the contract; (2) the results of its endeavor are beneficial to the other party, and (3) the other party retained those benefits.    _ADC-I, Ltd. v. Pan American Fuels, Limited-Gulf Coast, 247 Neb. 71, 75, 525 N.W.2d 190(1994)_

**_Campbell_**, as the record reflects, made an honest good faith effort to perform his part of the Contract. **_Campbell_** was performing his services and having all his invoices approved. [BOE 488:6-23]. **_Campbell_**'s effort only stopped

when MRE's expansion failed. MRE testified **_Campbell_** did not cause the breach. [BOE 358:4-10] [BOE 428:4-17]. MRE did benefit from **_Campbell_**'s goods and services and retained the same, even if that benefit was selling the received equipment on MRE's website. Under MRE's application of substantial performance, owners of failed construction projects would never be liable to subcontractors who, through no fault of their own, are stopped from completing their services. Such a theory is incorrect and does not support a defense, much less a Jury Instruction.

## 9.   EXHIBITS NO. 60 AND NO. 61 WERE PROPERLY [*40]  RECEIVED

 MRE argues Exhibit No. 60 and No. 61 should not have been entered into evidence. MRE's main argument is the Exhibits were not listed on the Trial Exhibit List, nor did **_Campbell_** motion the Court to amend the list.

 Exhibit Nos. 60 and 61 are from MRE's own website which was accessed by **_Campbell_**, as testified by Robert **_Campbell_**. [BOE 537-538]. The Exhibits identify equipment **_Campbell_** sold to the ethanol plant. The defense MRE presented was disputing delivery or the identical equipment. On rebuttal, as is permitted, **_Campbell_** presented the evidence to contradict verbal accusations raised by defense. Proper foundation was laid by Robert **_Campbell_**, and further the Exhibits constituted admissions against MRE's interest. MRE called Mark Dillon to testify. Mr. Dillon testified that he was asked seven years after the work was done to look for equipment. [BOE 457:2-24]. Dillon knew MRE was selling equipment, but did not know what items. [BOE 458:3-10]. Despite the amount of time passing, that Dillon was not aware of what items were for sale or sold, Dillon is absolutely sure the equipment was never at MRE. Again, Dillon was not part of Phase II, not part of the Purchase Order identified **[*41]** as Exhibit 10. Dillon did not do work on installation or approval of **_Campbell_**'s invoices or work. [BOE 461:3-25]. Without any supporting documentation, attempts to establish the product never made it to the ethanol plant.

 **_Campbell_** has the legal right to impeach the testimony of MRE's witness. The Exhibits of MRE's witness. The Exhibits 60 and 61 is where Dillon should have looked. MRE's website specifically, the pages that show all the new and used equipment for sale by MRE, including ten cabinets which Dillon refused to acknowledge were, in fact, for sale on their website. I understand why MRE does not want their website evidence received. The Exhibits however, are impeachable admissible evidence.


## VI. CONCLUSION

 For all the foregoing reasons, Appellee prays this Court to find the District Court and the Jury Orders be affirmed and the Judgment remain in full force an effect.

**PROOF/AFFIDAVIT OF SERVICE**

 STATE OF NEBRASKA

 COUNTY OF DOUGLAS

Karl Von Oldenburg, being first duly sworn upon oath, deposes and states as follows:

 1. That I am at least 18 years of age or older and am competent to testify in this matter.

 2. That I am the attorney of record for the above-named **[*42]** Appellee.

 3. That I prepared and submitted the Brief of the Appellee.

 4. That I served two (2) true and correct copies of the Brief of the Appellee upon counsel for the Appellant, via First Class U.S. Mail, postage prepaid, on this 30th day of November, 2015, at the following address: Jerold L. Strasheim, 3610 Dodge Street, Suite 212, Omaha, NE 68131-3218.

 FURTHER, AFFIANT SAYETH NAUGHT.

 R. M. **_CAMPBELL_** INDUSTRIAL, INC.,

2015 NE S. CT. BRIEFS LEXIS 153, *42

Appellee

By:   /s/ [Signature]

KARI VON OLDENBURG, #20228

Brumbaugh & Quandahl/PCJXO_

4885 South 118th Street, Suite 100

Omaha, NE 68137

Tel: (402)554-4400

Fax: (402)554-0339

Email: *kvonoldenburg@bqlaw.com*

SUBSCRIBED AND SWORN to before me on this 30th day of November, 2015.

/s/ [Signature]

Notary Public

---

**End of Document**